**SHOEMAKER, Admr., Appellee,**

v.

**CRAWFORD et al., Appellees;**

**Zitter, Appellant.**

[Cite as *Shoemaker v. Crawford* (1991), 78 Ohio App.3d 53.]

Court of Appeals of Ohio,
Franklin County.

No. 91AP–358.

Decided Dec. 24, 1991.

**56**

---

*Wolske & Blue, Jason A. Blue, David Shaver* and *Michael S. Miller,* for appellee.

*Reminger & Reminger* and *W. Frederick Fifner,* for appellee Patrick Crawford, M.D.

*Porter, Wright, Morris & Arthur* and *James S. Oliphant,* for appellee Kwang–Taik Choi, M.D.

*Earl, Warburton, Adams & Davis* and *Ted L. Earl,* for appellee Mt. Carmel Hospital.

*Jacobson, Maynard, Tuschman & Kalur Co., L.P.A., Richard W. Stuhr, Karen L. Clouse* and *Maurice N. Milne III,* for appellant Diane M. Zitter, M.D.

McCormac, Judge.

Defendant-appellant, Diane M. Zitter, M.D., appeals from the judgment of the Franklin County Court of Common Pleas entered on the jury's verdict for appellee, Maggie F. Shoemaker, both individually and as administrator of the estate of her daughter, Connie S. Shockley, in the total amount of $3,000,000.

Appellant raises the following assignments of error:

"I. As a matter of law, the jury's narrative responses to Interrogatory No. 2C were not supported by the evidence adduced at trial, and the jury's verdict against Dr. Zitter was therefore not supported by any evidence, thus necessitating reversal of the judgment of the court below.

"II. Pursuant to Section 2307.43 of the Ohio Revised Code, plaintiff can recover a maximum of $200,000.00 as and for the general damages suffered by Connie Shockley prior to her death, and the jury's verdict must therefore be reduced to the sum of 1.2 million dollars.

"III. The trial erred to the substantial prejudice of this defendant in precluding evidence regarding the settlement agreement reached by defendants Crawford and Choi during the trial proceedings.

"IV. Based upon the jury's interrogatory answers assigning percentages of liability, this defendant may not be required to pay more than her proportionate share of the verdict, as found by the jury, in the event the verdict is upheld.

"V. The trial court erred to the substantial prejudice of this defendant in permitting plaintiff to introduce into evidence a diary written by plaintiff's decedent for the reason that that diary was not relevant to the issues at trial and was intended solely to inflame the passions of the jury.

"VI. The trial court erred as a matter of law in permitting the decedent's brother and sister to testify to and recover for their mental anguish and loss of society.

"VII. The trial court erred in failing to grant defendant's motion for new trial or remittitur for the reason that the amount of the jury's verdict was excessive, against the manifest weight of the evidence, and appears to have been the result of passion or prejudice.

"VIII. The trial court erred as matter of law in failing to grant defendant's motion for new trial."

This case arises from the death of Connie Shockley and her twenty-two-week-old fetus as the result of complications arising after her bowel obstruc-

tion surgery. The surgery was performed by Dr. Patrick Crawford. Appellant was present during surgery to assist and be available in case complications arose regarding the decedent's pregnancy.

. In order to fully understand the facts of this medical malpractice action, we must briefly review the decedent's past medical history. The decedent was born with a congenital abnormality known as a tracheoesophageal fistula. The condition arises when the esophagus fails to fully develop in utero. Instead of creating a passage from the mouth to the stomach, the upper portion of the esophagus ends in a blind pouch and the lower portion connects to the trachea. The condition is rectified by a series of surgeries, performed during infancy, which culminate in a colon interposition. A colon interposition involves the repositioning of a portion of the large bowel to take the place of the esophagus. One result of the numerous surgical procedures is the development of adhesions, fibrous bands of scar tissue, between and around the loops of the small intestine. These adhesions place the patient at greater risk for developing bowel obstructions in the future.

On February 16, 1988, the decedent was admitted to Mt. Carmel Medical Center with complaints of abdominal cramping and vomiting. At the time, she was twenty-two weeks pregnant. She was first seen by Dr. Scott McIlroy, a partner of appellant, who ruled out pre-term labor. McIlroy arranged a consultation with Crawford, a general surgeon. Based upon Crawford's examination and the decedent's past history, which included previous bowel obstruction surgeries in addition to the colon interposition, he concluded that she was again suffering from a bowel obstruction. After conservative efforts to decompress the stomach, Crawford scheduled the decedent for surgery.

The surgery commenced with a twofold purpose. Initially, Dr. Crawford found that the multiple adhesions must be cut in order to relieve the bowel obstruction itself. Secondly, the stomach and bowel needed to be decompressed. That is, the contents needed to be given a way to escape. The experts who testified agree that this was typically accomplished by one of two methods. Either a nasogastric tube was inserted down the esophagus into the patient's stomach, or a gastrointestinal tube was surgically placed through the patient's side directly into the stomach. The experts testified that the reason artificial decompression needed to be accomplished is that bowel surgery creates an ileus, or lack of propulsion in the bowel, which prohibits natural decompression for several days. For various reasons not relevant to this action, Crawford failed to provide any method for post-operative decompression.

At the conclusion of surgery, the decedent was moved to the surgical intensive care unit. When she arrived, she had a nasogastric tube in place that was shortly thereafter removed, because it had curled in the back of her mouth and could not be run down her esophagus as it should be to be effective. An endotracheal tube was also placed, which was inserted down the trachea to permit the flow of air. The endotracheal tube had a small inflatable collar which created a barrier to prevent significant amounts of bowel contents from being aspirated down the trachea and into the lungs. There was expert testimony indicating that, since no means of decompression were provided, the decedent was at a great risk of regurgitating her stomach contents and that some artificial means of blocking her airway was necessary.

The principal issues at trial centered on what happened, or should have happened, and who was, or was not, in charge of the decedent post-operatively. Appellant testified that it was her understanding that Crawford was leaving town immediately after the surgery. Crawford denied this, stating he was available by phone, and, in fact, visited the patient four days post-operatively. With this in mind, appellant asked Crawford if there were any special post-operative orders he required, to which he responded negatively. Appellant also consulted with Dr. Kwang–Taik Choi, the anesthesiologist involved, regarding post-operative management of the endotracheal tube. Appellant admitted that she had no prior experience in managing care of small-bowel patients generally and endotracheal tubes specifically. However, since none of the other operating team members was available, appellant took it upon herself to be responsible for the decedent's post-operative care.

At 12:00 a.m., February 17, approximately four hours after surgery, the decedent's anesthesia began to wear off and she started to buck the endotracheal tube. Appellant, acting on the advice of Choi as well as her own experience, extubated, removed the endotracheal tube from the decedent. While there was some expert testimony to the contrary, most of the experts agree that some time after extubation the decedent aspirated bowel fluids into her lungs which resulted in the stillbirth of her fetus on February 20, and the ultimate death of Connie Shockley on March 1, 1988.

After the close of evidence, the jury returned a verdict in favor of plaintiff in the amount of $3,000,000. In response to interrogatories, the jury allocated $2,000,000 to the survival action and $1,000,000 to the estate for damages suffered by next of kin by the death. The jury found both Crawford and Zitter negligent, allocating eighty percent of the negligence to Crawford and twenty percent to appellant.

By her first assignment of error, appellant contends that the jury's narrative responses explaining its finding of negligence were unsupported by the

evidence. The issue is whether the special interrogatories outlining appellant's specific acts of negligence are inconsistent and irreconcilable with the general verdict.

Special interrogatories are governed by Civ.R. 49. The rule requires the court to submit special interrogatories if the parties so request. If the jury's answers to the special interrogatories are inconsistent with its general verdict, then the court may enter judgment in accordance with the special interrogatories, return the jury for further deliberations, or order a new trial.

■ To render a judgment on special interrogatories, as against the general verdict, the trial court must conclude that the special findings are inconsistent and irreconcilable with the general verdict. *Otte v. Dayton Power & Light Co.* (1988), 37 Ohio St.3d 33, 523 N.E.2d 835. The party challenging the general verdict bears the burden of showing that the two are irreconcilable and inconsistent. *Becker v. BancOhio Natl. Bank* (1985), 17 Ohio St.3d 158, 17 OBR 360, 478 N.E.2d 776. The court must make every reasonable attempt to harmonize a special finding with the general verdict. *Klever v. Reid Brothers Express, Inc.* (1949), 151 Ohio St. 467, 39 O.O. 280, 86 N.E.2d 608.

■ The jury's general verdict found appellant guilty of negligence. In its answers to Special Interrogatory 2C, the jury listed three specific acts or courses of conduct in support of its general finding. The jury concluded that appellant was negligent by: "accepting responsibilities for a field outside her expertise, did not follow up on test results, lack of communication." These answers are consistent with the general verdict and amply supported by the evidence at trial.

Appellant herself admitted having no experience in managing small-bowel patients post-operatively. She also admitted to only limited experience in managing endotracheal tubes post-operatively. There was expert testimony indicating that an oximeter reading or a blood gas should have been done immediately after extubation and that the results of these tests would have red-flagged possible complications. Appellant testified that she did not receive a blood gas report until almost four hours after extubation and that she did not follow up on those results once received. Finally, the evidence overwhelmingly establishes that appellant did not communicate with the general surgeon prior to or shortly after extubation. There was also conflicting evidence concerning Crawford's availability for consultation that the jury could have decided against appellant.

The jury's special interrogatories meet the consistent and reconcilable test as set forth by the Ohio Supreme Court. Its special findings were consistent with its general verdict and the answers are supported by ample evidence.

█ Additionally, an issue of waiver arises. When the jury returned its verdict, the court expressly questioned the parties on whether they had anything to add. There was no response by any party. The remedies provided under Civ.R. 49 cannot be exercised in total once the jury is excused. Therefore, any objections to interrogatories must be raised while the jury is still impaneled and the court has the full range of choices before it. *Schade v. Carnegie Body Co.* (1982), 70 Ohio St.2d 207, 24 O.O.3d 316, 436 N.E.2d 1001. Appellant's failure to timely object to the interrogatories waived any error concerning their alleged inconsistencies.

Appellant's first assignment of error is overruled.

Appellant's second assignment of error raises the issue of Ohio's $200,000 statutory limit on general damages. The Supreme Court recently addressed this issue and held R.C. 2307.43 to be unconstitutional. *Morris v. Savoy* (1991), 61 Ohio St.3d 684, 576 N.E.2d 765.

Accordingly, appellant's second assignment of error is overruled.

Appellant next contends that the trial court erred by precluding evidence of a settlement agreement reached between appellee and defendants Crawford and Choi. Appellant argues that the agreement should have been introduced to show possible bias.

The agreement at issue was entered into after the beginning of trial and before defendants completed submission of their evidence. The compromise guaranteed appellee a minimum payment in exchange for appellee's agreement not to proceed against the two defendants personally if the verdict exceeded the limits of their malpractice insurance. The agreement was disclosed to the court and was extensively discussed with the trial court posing several hypothetical verdicts in order to understand the ramifications of the settlement. Appellant was not a party to the agreement.

█ As a general rule, Evid.R. 408 precludes the admission of compromise offers unless they are used to show prejudice or bias. However, even if relevant, they may be excluded if their probative value is outweighed by the possibility of misleading or confusing the jury. Evid.R. 403(A). The submission or exclusion of evidence is within the sound discretion of the trial court. *Calderon v. Sharkey* (1982), 70 Ohio St.2d 218, 24 O.O.3d 322, 436 N.E.2d 1008. A trial court's exclusion of evidence will not be overturned absent an abuse of discretion. The decision must be unreasonable, unconscionable, or clearly wrong. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 5 OBR 481, 450 N.E.2d 1140.

█ The decision of the trial court to exclude the settlement agreement was not unreasonable or manifestly wrong. The trial court explored several

scenarios where the agreement could actually benefit appellant and harm the two settling doctors. Therefore, the issue of bias was not clear and, hence, best left to the discretion of the trial court. Furthermore, the in-chambers discussions were aimed primarily at explaining the agreement to the court. The discussions were lengthy and, at times, complicated. It is evident that if the court attempted to explain the agreement to the jury considerable confusion might arise. As such, the trial court was justified under either Evid.R. 408 or 403 in excluding the evidence. Further, it was undoubtedly obvious to the jury that the defendants were not in agreement as to which doctor was responsible.

Appellant's third assignment of error is overruled.

■ Appellant's fifth assignment of error also takes issue with an evidentiary ruling and will be discussed next. Appellant contends that a diary written by the decedent in expressing her joy over the pending birth of a child was irrelevant and was solely intended to inflame the passions of the jury.

The same standard of review applies to the diary as applied to the settlement agreement. Evidentiary rulings will not be overturned if relevant and not privileged unless the trial court abused its discretion. *Calderon, supra; Blakemore, supra.*

The diary is very short, consisting of only five pages in a loose-leaf notebook. Substantially the same testimony was given by the decedent's family members who were cross-examined by appellant. The decedent was an unwed mother and the diary was introduced to show that she indeed wanted the child even though she was not married. The diary was not overly emotional but merely expressed the thoughts normally associated with the birth of a child. Since the decedent could not be present to express her own thoughts, the diary was not cumulative nor do we find it prejudicial.

Appellant's fifth assignment of error is overruled.

■ Appellant's sixth assignment of error raises the issue of recovery rights for next of kin under R.C. 2125.02. It is appellant's position that recovery by the decedent's adult brother and sister is precluded as a matter of law.

Ohio's wrongful death statute, R.C. 2125.01 *et seq.*, is not a model of clarity and has caused considerable debate among commentators. Prior to 1982, R.C. 2125.02 provided:

"An action for wrongful death must be brought in the name of the personal representative of the deceased person, but shall be for the exclusive benefit of the surviving spouse, the children, and other next of kin of the decedent. * * * "

In 1982, this section was extensively amended to its present form. The portions relevant to this action now read:

"(A)(1) An action for wrongful death shall be brought in the name of the personal representative of the decedent for the exclusive benefit of the surviving spouse, the children, and the parents of the decedent, all of whom are rebuttably presumed to have suffered damages by reason of the wrongful death, and for the exclusive benefit of the other next of kin of the decedent.

"* * *

"(B)(5) The mental anguish incurred by the surviving spouse, minor children, parents, or next of kin."

Appellant argues that subsection (B)(5) must be read in the disjunctive, meaning that next of kin may recover only if the decedent is not survived by a spouse, parent, or children. Support for this proposition can be found in *Bennett v. Cleveland* (June 5, 1986), Cuyahoga App. No. 50479, unreported, 1986 WL 6357, cited without comment in *Molton v. Cleveland* (C.A.6, 1988), 839 F.2d 240, and *Urseth v. Dayton* (S.D.Ohio 1987), 680 F.Supp. 1150.

Appellee cites R.C. 1.02(F), which permits "or" to be read as "and" if appropriate and argues that the mental anguish suffered by next of kin should be considered regardless of who survived the decedent. Appellee relies in part on another Cuyahoga County case, *In re Estate of Forbes* (Aug. 25, 1988), Cuyahoga App. No. 54226, unreported, 1988 WL 88853. In *Forbes*, the court held that the decedent's sister could recover despite the existence of a wife, mother and children. The court reasoned that the survivors first mentioned, spouse, children and parents, were rebuttably presumed to have incurred damages and that next of kin could recover if they clearly established their loss.

Appellee's interpretation of R.C. 2125.02(B)(5) is the more logical when R.C. 2125.02 is read in its entirety. If subsection (B)(5) is read alone, it seems to be phrased in the disjunctive. However, when it is read together with subsection (A)(1), the two cannot be harmonized unless next of kin are permitted to recover.

Prior to the 1982 amendments, R.C. 2125.02 included next of kin along with parents, children and spouses as the parties in whose name and for whose exclusive benefit the action was to be brought. The 1982 amendments deleted next of kin from the first part of this section and inserted the new rebuttable-presumption language. Finally, at the end of this section, after the presumption language, the legislature reinserted next of kin and carried forward the same exclusive-benefit language as was used to describe spouses, parents and

children. The legislature also added subsection (B), which gave a list of recoverable damages and included (B)(5), which is at issue herein.

The most convincing argument that next of kin, as contained in R.C. 2125.02(B)(5), are not limited to recovery for mental anguish if there are a surviving spouse, parents, or minor children, is that adult children are included within the term "next of kin." Yet, R.C. 2125.02(A)(1) provides that *all* children are rebuttably presumed to have suffered damages. Generally, those presumed damages would be loss of society under (B)(3) or mental anguish under (B)(5), the only provisions in which minor children are separated (for some unknown reason) from adult children.

Originally, Ohio's wrongful death statute permitted recovery only of pecuniary damages. The 1982 amendments added loss of society and mental anguish as elements of compensable damage. Both of the subsections dealing with the newly permitted damages include "or next of kin" language. In keeping with the new intent of the statute, to compensate these types of mental suffering, it is concluded that next of kin may recover. A brother, sister, or adult child can suffer grief over the loss of a sibling just as can a mother, parent, or minor child. To exclude one group simply because another exists would partially thwart the intent of the statute's amendments.

When R.C. 2125.02(A)(1) and (B)(5) are read together, it is logical to conclude that parents, children, and spouses are rebuttably presumed to have suffered damages and that other next of kin must be put to their proof. Parents, children, and spouses share different bonds with the decedent and it was reasonable for the legislature to conclude that they would nearly always suffer some form of mental anguish over their loss. It is also reasonable to conclude that the legislature felt brothers and sisters and other next of kin do not necessarily have the same bond and that this group should have the burden of proving any damages. However, to categorically exclude next of kin simply because another incomplete category of survivors exists is inconsistent with the statute when read as a whole.

Therefore, it was proper for the trial court to permit the testimony of the decedent's brother and sister to prove any mental anguish that they suffered from her death.

Appellant's sixth assignment of error is overruled.

■ Appellant's seventh and eighth assignments of error are interrelated and will be discussed together. By these assignments of error, appellant argues that the trial court erred in failing to grant her request for a new trial or remittitur.

Appellant's new trial argument is based upon Civ.R. 59(A)(4), in that the jury's $2,000,000 verdict to the estate of Connie Shockley was excessive, appearing to have been a result of passion or prejudice. In order to conclude that the verdict was the result of passion or prejudice, it must appear in the record that the award was induced by:

"3. * * * (a) admission of incompetent evidence, (b) by misconduct on the part of the court or counsel, or (c) by any other action occurring during the course of the trial which can reasonably be said to have swayed the jury in their determination of the amount of damages that should be awarded." *Fromson & Davis Co. v. Reider* (1934), 127 Ohio St. 564, 189 N.E. 851, paragraph three of the syllabus.

The amount of the verdict alone will not sustain a finding of passion or prejudice. There must be something contained in the record which the complaining party can point to that wrongfully inflamed the sensibilities of the jury. Appellant contends that the introduction of decedent's diary injected an element of unfair passion and prejudice into this trial. We have previously concluded that the diary's admission was not error and, hence, its admission does not establish passion or prejudice. Furthermore, in our review of the record we have failed to find anything that would meet the *Fromson* criteria for establishing a verdict based on undue passion or prejudice.

However, a verdict may still be excessive even though it was not the result of passion or prejudice. In which case, this court cannot order a new trial, but may reduce the verdict by remittitur and affirm the jury's award as reduced. As the Supreme Court stated in *Larrissey v. Norwalk Truck Lines* (1951), 155 Ohio St. 207, 219, 44 O.O. 238, 243, 98 N.E.2d 419, 426:

" * * * [I]f a verdict in an action for unliquidated damages is excessive, but not appearing to have been influenced by passion or prejudice, the court may, with the assent of plaintiff, reduce the verdict by remittitur to any amount warranted by the evidence." See, also, *Duracote Corp. v. Goodyear Tire & Rubber Co.* (1983), 2 Ohio St.3d 160, 2 OBR 704, 443 N.E.2d 184.

The jury awarded $2,000,000 to the estate of Connie Shockley for thirteen days of pain and suffering. We do not dispute that her last thirteen days were exceedingly painful, but the jury's verdict is so large that it appears to have been based on sympathy rather than on the evidence. Mathematically, the award amounts to over $150,000 per day. There is obviously a point beyond which the award is not compensation but punishment. We recognize the jury's dilemma, particularly when their experience is so limited in regard to this type of unliquidated damages.

Typically, assessing damages is left to the discretion of the jury and will not be overturned by a reviewing court. However, as a longstanding matter of policy, an appellate court may reduce the jury's award if it appears to be beyond the realm of proper compensation for the decedent's suffering. *Duracote, supra.*

Determining the amount of damages which is the maximum for adequate compensation is not an easy task. No simple mathematical formula can be applied as to either a minimum or a maximum, and there is a wide range between those figures. The decision rests as much on policy considerations as it does anything else and some degree of arbitrariness cannot be totally divorced from the decision, whether made by us or by the jury.

Upon review of the entire record, it is our opinion that an award to the estate of Connie Shockley of $500,000 is the maximum allowable compensation for those thirteen days of suffering. Therefore, the judgment for damages to the estate for the survival action is reduced to $500,000. Appellee may elect to accept the $1,500,000 remittitur and accept a judgment of $500,000 on the survival action or may refuse the remittitur, in which case a new trial will be ordered on the issue of damages only in the survival action.

Appellant's seventh and eighth assignments of error are sustained to the extent that a remittitur is ordered, conditioned upon appellee's acceptance, or, upon appellee's refusal, a new trial is ordered addressed to the value of decedent's damages for pain and suffering prior to her death.

Finally, we address appellant's fourth assignment of error, argued in the alternative, that appellant may not be required to pay more than her proportional share of the verdict, as found by the jury in its apportionment of negligence. Since we have reduced the verdict to the extent necessary to reduce appellant's total liability to a twenty-percent proportional share, this assignment of error is moot. However, we will address the error in light of the fact that appellee may elect a new trial rather than accept the remittitur.

Under the rather unusual circumstances of this case, the two settling defendants agreed to pay a maximum of $1,200,000 and were released from liability for any amounts in excess of that figure. If appellee accepts the remittitur, the total verdict now stands at $1,500,000. Appellant would be entitled to a setoff of the $1.2 million paid by the other defendants but would be left to satisfy the remaining $300,000 judgment. It is appellant's position that, since her negligence was apportioned by the jury at twenty percent, she should be required to pay only twenty percent of the total verdict. Appellant's argument ignores the concept of joint and several liability.

Joint and several liability implies that, where damages are caused by the joint acts of two or more persons, each defendant may be held liable for

damages incurred jointly or severally. *Transfer v. Kelly* (1880), 36 Ohio St. 86. Judgment can be taken against any joint tortfeasor for the entire amount. Apportionment applies to contribution among the various tortfeasors and not to an individual joint tortfeasor's liability to the plaintiff. As the Supreme Court stated in *Natl. Mut. Ins. Co. v. Whitmer* (1982), 70 Ohio St.2d 149, 151–152, 24 O.O.3d 248, 249, 435 N.E.2d 1121, 1123:

"It is clear from the provisions of the Act that the liability for contribution is distinct from the liability for the jointly committed tort. Liability to an injured party arises at the time of the tort. Liability for contribution arises only in favor of a joint tortfeasor and then only when that tortfeasor has paid more than his proportionate share of the common liability. Ohio's statutory scheme for contribution does not concern the basic relationship of tortfeasors to one who has suffered injury but establishes the relationship of tortfeasors *inter se* when one of them discharges the common liability."

Therefore, the issue of proportionality of payment is an issue simply between the tortfeasors themselves and not between an individual tortfeasor and plaintiff. Plaintiff, if she so chooses, may collect the entire judgment from any joint tortfeasor and that tortfeasor is then left to pursue her remedies against the other joint tortfeasors.

█ If the settlement agreement entered into between Crawford and Choi was done so in bad faith, as appellant alleges, it too is an issue between the defendants and not between appellee and appellant. Appellee can look to appellant to satisfy the entire judgment, less any sums paid by way of settlement, regardless of the validity of the settlement agreement. If the agreement is invalidated, that would only affect appellant's rights of contribution and not appellee's rights to collect its joint and several judgment.

Appellant's fourth assignment of error is overruled.

Appellant's first, second, third, fourth, fifth and sixth assignments of error are overruled, and appellant's seventh and eighth assignments of error are sustained to the extent indicated in the opinion. The judgment of the trial court is affirmed as to the $1,000,000 verdict for wrongful death. A remittitur of $1,500,000 is ordered for the survival action reducing the verdict from $2,000,000 to $500,000 contingent upon acceptance by the decedent's estate within a period of time established by the trial court. If plaintiff's estate does not accept the remittitur, a new trial of the survival action is ordered on the issue of damages only. Costs are to be divided equally among the parties.

*Judgment partially affirmed*
*and partially reversed.*

STRAUSBAUGH and JOHN C. YOUNG, JJ., concur.