OPINION
{¶ 1} Appellant, Lisa Ochletree, Executrix of the Estate of Margaret Gillespie, deceased, appeals from the January 4, 2005 judgment entry of the Trumbull County Court of Common Pleas, denying her motion for judgment notwithstanding the verdict and/or new trial.
 {¶ 2} On June 30, 2000, appellant filed a complaint against defendant Trumbull Memorial Hospital ("TMH"), and appellees, Nicola Demacopoulos, M.D. ("Dr. Demacopoulos"), and Warren Physician Group, for medical malpractice, negligence, and wrongful death. Appellant's complaint alleges that in July 1999, Margaret Gillespie ("the decedent") was admitted into the care of defendant TMH and appellees; defendant TMH and appellees negligently failed to care for the decedent; defendant TMH and appellees rendered negligent medical care to the decedent; and as a direct and proximate result of the negligence, the decedent expired. On August 4, 2000, appellees filed an answer. Defendant TMH filed an answer on August 15, 2000.
 {¶ 3} A jury trial commenced on March 15, 2004.[1]
 {¶ 4} At the trial, appellant called four nurses from TMH to testify, who were on duty on July 6, 1999 and/or July 7, 1999.
 {¶ 5} Registered Nurse Chris Ronyak ("Ronyak") stated that she provided care for the decedent after her total knee replacement surgery. Ronyak indicated that the decedent was alert and oriented.
 {¶ 6} Registered Nurse Lawrence Hackett ("Hackett") testified that he performed assessments, which revealed that the decedent was alert and under no distress. Hackett telephoned the decedent's physician, appellee Dr. Demacopoulos, in order to get her home medications ordered. He later determined that the decedent's condition had changed, that she was no longer alert and oriented, and that her blood pressure had temporarily dropped, then rebounded. After performing a sternal rub on the decedent, she still was lethargic and failed to open her eyes. At that time, Hackett called appellee Dr. Demacopoulos a second time, who told him to run blood tests and an arterial blood gas, as well as to put her I.V. wide open for one hour. After calling appellee Dr. Demacopoulos back for the third time with the results which showed some abnormalities regarding the decedent's oxygen saturation, appellee Dr. Demacopoulos gave Hackett orders for a stat lung scan. On cross-examination, Hackett indicated that he never felt that it was necessary to call the house physician on staff regarding the decedent's condition.
 {¶ 7} Registered Nurse Gilbert Dalton ("Dalton") testified that he treated the decedent during his night shift. He assessed her as being somewhat lethargic and unresponsive. Dalton indicated that the decedent's lung scan was essentially normal and that she had no changes that night. Dalton was told by appellee Dr. Demacopoulos to monitor the decedent's vital signs and that if they remained stable, he would re-evaluate her in the morning. Dalton was recommended by the charge nurse to contact Dr. Brodell,[2] the decedent's surgeon, which he did at 6:30 a.m. He told Dr. Brodell over the telephone that the decedent was still lethargic and unresponsive. Dr. Brodell advised him to call appellee Dr. Demacopoulos regarding transferring the decedent to I.C.U. Dalton indicated that he did not contact appellee Dr. Demacopoulos nor did he transfer the decedent to I.C.U. because his shift was over. On cross-examination, Dalton maintained that the decedent's vital signs were perfectly normal, and that he had no reason to call appellee Dr. Demacopoulos.
 {¶ 8} Registered Nurse Jack Norton ("Norton") indicated that he performed an assessment on the decedent on the morning of July 7, 1999. He recorded her as being unresponsive but that she moved her right arm during a sternal rub. After transferring the decedent to I.C.U. at 7:55 a.m., Norton had no further involvement with her. On cross-examination, Norton said that the decedent's condition had deteriorated from what Dalton had charted. On re-direct, Norton stated that the decedent's condition was the same except that her left arm went from weak to flaccid.
 {¶ 9} Appellee Dr. Demacopoulos was called by appellant to testify on cross-examination. He maintained that although he did not hold the nurses responsible, he did not remember ever being told by them that the only way to arouse the decedent was with a sternal rub, or that she was unresponsive. If so, he would have come in at that time to see the patient. Rather, appellee Dr. Demacopoulos stated that the nurses told him that the decedent was lethargic, fatigued, and was given a lot of medication throughout the time period after her surgery. He said that the decedent had been non-compliant with taking her medications for anxiety and blood pressure since she became his patient in 1994.
 {¶ 10} Appellant also called three expert witnesses to testify on her behalf.
 {¶ 11} Dr. Raymond Parker ("Dr. Parker"), a board certified physician from Miami, Florida, who specialized in pulmonary and critical care medicine, testified that he reviewed the records at issue at great length. Dr. Parker believed that the decedent was not groggy or lethargic, but rather was unarousable, a significant change in mental status. Dr. Parker opined that the decedent's condition warranted appellee Dr. Demacopoulos to come into the hospital to evaluate her. On cross-examination, Dr. Parker indicated that from a neurological standpoint, the decedent died from a brain stem stroke. He stated that he was critical of the nurses' assessments of the decedent, and because they did not call the house physician.
 {¶ 12} Dr. Jack Riggs ("Dr. Riggs"), a Professor of Neurology at West Virginia University, stated that the incident probably would not have occurred if appellee Dr. Demacopoulos or the house doctor on duty would have examined the patient in response to the nurses' phone calls. Dr. Riggs indicated that the theory that the decedent died from an embolic stroke requires some proof of a source and in his opinion there was no evidence of a source. On cross-examination, Dr. Riggs was critical of the nurses. He agreed that nurses sometimes do not communicate all of the necessary information to the physician.
 {¶ 13} According to Dr. Hadley Morgenstern-Clarren ("Dr. Clarren"), who is in private practice in Cleveland, Ohio, as well as teaches at Case Western Reserve University School of Medicine, he reviewed the decedent's medical records and opined that appellee Dr. Demacopoulos fell below the standard of care. Dr. Clarren indicated that if appellee Dr. Demacopoulos chose to not come in personally to evaluate the decedent, then he should have requested the house physician to assess her.
 {¶ 14} Appellees called three experts to testify on their behalf.
 {¶ 15} Dr. Raymond Rozman ("Dr. Rozman"), a board certified internist from Cleveland, Ohio, indicated that the decedent's prior medical records showed that she had lung disease and a decreased oxygen level. He opined that the decedent died suddenly of complications from an embolic stroke, due to the results of the CT scan.
 {¶ 16} Dr. Robert Tarr ("Dr. Tarr"), a board certified neuro-radiologist with University Hospitals in Cleveland, Ohio, testified that he reviewed the decedent's films, and opined that she died from an embolic stroke. Dr. Tarr did not believe that the decedent suffered a stroke due to low oxygen, but rather from a blood clot or a series of blood clots. He maintained that the stroke was not treatable.
 {¶ 17} Dr. Anthony Furlan ("Dr. Furlan"), a neurologist at the Cleveland Clinic Foundation originally identified as a potential witness on behalf of defendant TMH, presented his trial testimony by a June 13, 2003 video deposition. Dr. Furlan opined that based on the imaging patterns on the decedent's MRI, emboli or clots broke off from somewhere in the circulatory system, traveled to the brain, and obstructed the brain arteries which caused the stroke or infarcts. He did not believe that the decedent's stroke was caused by a hypoxic event. Dr. Furlan indicated that it would not have made any difference if a physician were at the decedent's bedside due to the massive nature of her embolic stroke. On cross-examination, Dr. Furlan said that in a prior deposition, which took place in August 2002, he stated that the stroke could have been embolic because it fit that type of pattern.
 {¶ 18} After deliberations, on March 24, 2004, the jury entered a verdict in favor of appellees. Pursuant to the first jury interrogatory, the jury found that appellees deviated from the accepted standards of care. However, based on the second jury interrogatory, the jury found that appellant failed to prove by a preponderance of the evidence that the deviation proximately caused the decedent's death. Pursuant to its May 26, 2004 judgment entry, the trial court determined that the jury verdict was proper and entered judgment on behalf of appellees.
 {¶ 19} On June 9, 2004, appellant filed a timely motion for judgment notwithstanding the verdict pursuant to Civ.R. 50(B), or in the alternative for a new trial based on Civ.R. 59(A). Appellees filed a brief in opposition to appellant's motion on July 14, 2004.
 {¶ 20} Pursuant to its January 4, 2005 judgment entry, the trial court denied appellant's motion for judgment notwithstanding the verdict and/or new trial. It is from that judgment that appellant filed a timely notice of appeal and makes the following assignments of error:
 {¶ 21} "[1.] The trial court erred, to the prejudice of appellant, in denying her motion for judgment notwithstanding the verdict because reasonable minds could only have concluded that appellee[s'] negligence proximately caused [the decedent's] death.
 {¶ 22} "[2.] The trial court erred, to the prejudice of appellant, in denying her motion for a new trial where the jury undoubtedly lost its way and created such a manifest miscarriage of justice that the verdict should have been reversed and a new trial ordered.
 {¶ 23} "[3.] The trial court erred, to the prejudice of appellant, in admitting into evidence, over her objection, Dr. Furlan's videotaped trial testimony."
 {¶ 24} In her first assignment of error, appellant argues that the trial court erred by denying her motion for judgment notwithstanding the verdict. She contends that reasonable minds could only have concluded that appellees' negligence proximately caused the decedent's death. Appellant alleges that the verdict was not justified by substantial evidence in the medical records or from appellees' expert testimony at trial.
 {¶ 25} Civ.R. 50(B) governs motions for judgment notwithstanding the verdict and provides: "* * * a party may move to have the verdict and any judgment thereon set aside and to have judgment entered in accordance with his motion * * * but no judgment shall be rendered by the court on the ground that the verdict is against the weight of the evidence. * * *"
 {¶ 26} This court stated in Nozik v. McDonald (June 25, 1999), 11th Dist. Nos. 97-L-235 and 97-L-252, 1999 Ohio App. LEXIS 2957, at 20-21:
 {¶ 27} "A motion for a judgment notwithstanding the verdict presents a question of law regarding the sufficiency of the evidence. See Jenkins v. Krieger (1981), 67 Ohio St.2d 314,317-319 * * *. Thus, if reasonable minds could reach different conclusions regarding the evidence, such motion must be denied. See, generally, Motorists Mut. Ins. Co. v. Hamilton Twp.Trustees (1986), 28 Ohio St.3d 13 * * *." (Parallel citations omitted.)
 {¶ 28} In the case at bar, reasonable minds could reach different conclusions when reviewing all of the evidence presented by each party. Appellant's experts opined that the decedent suffered a period of reduced blood flow and reduced oxygen that led to hypoxic brain injury. Appellees, on the other hand, presented expert testimony that the decedent suffered an embolic stroke after her operation which was unpreventable and untreatable.
 {¶ 29} Again, appellees' experts testified as follows: Dr. Rozman indicated that appellee Dr. Demacopoulos's actions did not proximately result in harm to the decedent, and that the decedent died suddenly of complications from an embolic stroke. Dr. Tarr testified that the cause of the decedent's death was more likely than not an embolic stroke rather than a hypoxic stroke as claimed by appellant. In addition, according to Dr. Furlan, he did not believe that the decedent's stroke was cause by a hypoxic event. Instead, Dr. Furlan opined that the decedent suffered from a massive embolic stroke.
 {¶ 30} Based upon the foregoing, reasonable minds could conclude that the decedent died from an embolic stroke. Apparently, the jury chose to believe appellees' experts. Appellant's first assignment of error is without merit.
 {¶ 31} In her second assignment of error, appellant alleges that the trial court erred by denying her motion for a new trial. Appellant contends that the jury undoubtedly lost its way and created such a manifest miscarriage of justice that the verdict should have been reversed and a new trial ordered. Appellant stresses that it was against the weight of the evidence and contrary to law that the jury found appellees negligent, but not the proximate cause of the decedent's death.
 {¶ 32} It is within the sound discretion of the trial court to grant or deny a new trial under Civ.R. 59. Hathy v. Conway
(Nov. 17, 1995), 11th Dist. No. 95-A-0013, 1995 Ohio App. LEXIS 5106, at 3, citing Rohde v. Farmer (1970), 23 Ohio St.2d 82,90. The trial court must engage in a limited weighing of the evidence when presented with a motion for a new trial. Demski v.Sidwell, 11th Dist. No. 2002-T-0058, 2003-Ohio-1423, at ¶ 15, citing Rohde at 92. An appellate court will not reverse a Civ.R. 59 motion absent an abuse of discretion. Demski at ¶ 16, citing Mannion v. Sandel (2001), 91 Ohio St.3d 318, 321. "An abuse of discretion connotes more than simply an error of law or judgment; rather, it implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable." Demski at ¶ 16, citing Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 33} When the claim is that the jury verdict is against the manifest weight of the evidence, a reviewing court must examine the entire record to determine if the verdict is supported by some competent, credible evidence. C.E. Morris Co. v. FoleyConstr. Co. (1978), 54 Ohio St.2d 279, syllabus. An appellate court will not overturn a verdict supported by competent, credible evidence. Seasons Coal Co., Inc. v. Cleveland (1984),10 Ohio St.3d 77, 80.
 {¶ 34} In the instant matter, the trial court stated the following in its January 4, 2005 judgment entry:
 {¶ 35} "[t]he experts disagreed as to the question of proximate cause. The jury accepted [appellees'] experts' testimony over [appellant's] experts. Whether this [c]ourt in reviewing the jury's conclusion agrees or not is not relevant. The jury had before it competent[,] substantial and credible evidence as to the question of proximate cause and they found in favor of [appellees]. This [c]ourt has no cause to grant a new trial. There is nothing in the record to clearly show that the jury reached a seriously erroneous result or that a manifest injustice has been done by the verdict."
 {¶ 36} We agree.
 {¶ 37} Again, the jury heard testimony from four nurses and three experts called by appellant, and came to the conclusion that appellees were negligent because they deviated from the accepted standards of care. However, although appellant and appellees put forth conflicting testimony, the jury was provided with competent, credible evidence from which to conclude that appellees' negligence was not the direct and proximate cause of the decedent's death. Again, Dr. Rozman opined that the decedent died suddenly of complications from an embolic stroke. Dr. Tarr testified that the decedent's embolic stroke was not treatable. Additionally, Dr. Furlan stated that the decedent's stroke was not caused by a hypoxic event, and that it would have made no difference if a physician were at the decedent's bedside. With respect to the issue of proximate cause, the jury chose to believe appellees' experts over appellant's experts.
 {¶ 38} Indulging every reasonable presumption in favor of the trial court's judgment in this case, we cannot conclude that the jury's verdict was against the weight of the evidence. Appellant's second assignment of error is without merit.
 {¶ 39} In her third assignment of error, appellant alleges that the trial court erred by admitting into evidence, over her objection, Dr. Furlan's videotaped deposition testimony. Appellant posits two issues for review. In her first issue, she contends that because expert testimony is admissible only when it states a probability, rather than a mere possibility, the trial court abused its discretion when it admitted Dr. Furlan's opinions into evidence. In her second issue, appellant maintains that Dr. Furlan's videotaped testimony was prejudicial because it confused and misled the jury by commingling the distinct issues of breach of duty of defendant TMH, who was no longer a party. Also, appellant argues that appellees had ample opportunity to bring Dr. Furlan in for live testimony.
 {¶ 40} With respect to her first issue, appellant relies onShumaker v. Oliver B. Cannon Sons, Inc. (1986),28 Ohio St.3d 367, for the proposition that Dr. Furlan's videotaped testimony should have been inadmissible. The issue in Shumaker was whether the trial court erred by admitting expert testimony concerning the mere possibility of a causal connection in a personal injury action. Id. at 369. The doctor responded to the hypothetical question of whether or not the plaintiff's cancer could have been caused by fumes to which he had been exposed at work. The Supreme Court of Ohio held that when establishing proximate cause through expert testimony, the expert's opinion as to what was the proximate cause must be stated at a level of probability, not mere possibility. Id. See, also, Stinson v.England (1994), 69 Ohio St.3d 451, paragraph one of the syllabus.
 {¶ 41} Here, appellant stresses that Dr. Furlan initially testified that his opinion would be based upon a reasonable degree of medical certainty. However, because Dr. Furlan modified his statements by agreeing to his previous deposition testimony where he used the words "could" and "possible" to explain whether or not the decedent died from an embolic stroke, appellant alleges that Shumaker is applicable. We do not agree with appellant that such circumstances render Dr. Furlan's opinions inadmissible, as she relies on old law.
 {¶ 42} In Coe v. Young (2001), 145 Ohio App.3d 499,503-504, this court stated:
 {¶ 43} "In Miller v. Bike Athletic Co. (1998),80 Ohio St.3d 607 * * *, the Supreme Court of Ohio designated the following four factors, adopted from Daubert v. Merrell DowPharmaceuticals, Inc. (1993), 509 U.S. 579, 593-594 * * *, to be considered in evaluating the reliability of scientific evidence: (1) whether the theory or technique has been tested, (2) whether it has been subjected to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance. Miller at 611, citing Daubert
at 593-594. Both the United States Supreme Court, in Daubert,
and the Supreme Court of Ohio, in Miller, emphasized that none of the factors is determinative: `the focus is "solely on principles and methodology, not on the conclusions that they generate." Miller at 613; citing Daubert at 595. Thus, there is no requirement that an expert utter any `magic language;'i.e. that his opinion was within the reasonable degree of certainty or reasonable degree of certainty within the particular knowledge of his professional experience." (Parallel citations omitted.) See, also, State v. Demetris, 11th Dist. No. 2001-T-0025, 2002-Ohio-3711, at ¶ 70; State v. Ludwick, 11th Dist. No. 2002-A-0024, 2004-Ohio-1152, at ¶ 33.
 {¶ 44} Based on Coe, Miller, and Daubert, supra, because Dr. Furlan was not required to utter any magic language, his opinions were clearly admissible. Appellant's first issue is without merit.
 {¶ 45} With regard to her second issue, Evid.R. 403(A) provides: "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." The exclusion of evidence on this basis rests within the sound discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of discretion. Shoemaker v.Crawford (1991), 78 Ohio App.3d 53, 61.
 {¶ 46} In the instant case, appellant's counsel objected to appellees presenting Dr. Furlan's testimony via videotape, and argues here that appellees intentionally waited until the last minute to contact the physician to ensure that he would be unavailable to testify in person. However, a review of the record reveals that in his June 13, 2003 deposition, Dr. Furlan indicated that he could not testify live at the trial due to patient and hospital obligations. Although Dr. Furlan may have been "voluntarily" absent, the facts support the admission of the videotaped deposition. Civ.R. 32; Ballard v. Jackson (Jan. 28, 1987), 2d Dist. No. CA 9988, 1987 Ohio App. LEXIS 5708, at 13-14;Descamps v. Kripke (Sept. 29, 2000), 6th Dist. No. L-99-1411, 2000 Ohio App. LEXIS 4439, at 4-5.
 {¶ 47} Appellant's reliance on Gaves v. Cabi (Dec. 12, 1997), 11th Dist. Nos. 96-T-5506, 96-T-5537, and 97-T-0026, 1997 Ohio App. LEXIS 5570, for the proposition that videotaped deposition testimony by a settled party is inadmissible is misplaced. In Gaves, this court determined that based on the facts in that case, the trial court did not abuse its discretion by excluding videotaped deposition testimony of the appellant's expert who was no longer a party to the action. Id. at 8. We held that the exclusion of evidence rested within the sound discretion of the trial court and would not be disturbed on appeal absent an abuse of discretion. Id. at 7.
 {¶ 48} Here, we note that the nurses' negligence was discussed by appellant's own expert witnesses. Also, appellant had notice before trial that appellees intended to use Dr. Furlan's videotaped deposition. Whether or not defendant TMH settled and was dismissed from the suit does not negate the fact that appellant was on notice. Hunt v. Crossroads Psych. Psychological Ctr. (Dec. 6, 2001), 8th Dist. No. 79120, 2001 Ohio App. LEXIS 5388, at 13. The trial court did not abuse its discretion by admitting the videotaped deposition testimony. Appellant's second issue is not well-taken.
 {¶ 49} Appellant's third assignment of error is without merit.
 {¶ 50} For the foregoing reasons, appellant's assignments of error are not well-taken. The judgment of the Trumbull County Court of Common Pleas is affirmed.
O'Neill, J., Grendell, J., concur.
[1] Prior to trial, defendant TMH settled with appellant, and is not a party to the instant appeal. The amount of the settlement is not specified in the record.
[2] We note that Dr. Brodell's first name was not contained in the record.