OPINIONS OF THE SUPREME COURT OF OHIO
The full texts of the opinions of the Supreme Court of
Ohio are being transmitted electronically beginning May 27,
1992, pursuant to a pilot project implemented by Chief Justice
Thomas J. Moyer.

Please call any errors to the attention of the Reporter's
Office of the Supreme Court of Ohio. Attention: Walter S.
Kobalka, Reporter, or Deborah J. Barrett, Administrative
Assistant. Tel.: (614) 466-4961; in Ohio 1-800-826-9010.
Your comments on this pilot project are also welcome.

NOTE: Corrections may be made by the Supreme Court to the
full texts of the opinions after they have been released
electronically to the public. The reader is therefore advised
to check the bound volumes of Ohio St.3d published by West
Publishing Company for the final versions of these opinions.
The advance sheets to Ohio St.3d will also contain the volume
and page numbers where the opinions will be found in the bound
volumes of the Ohio Official Reports.

Moskovitz, Exr., et al., Appellants, v. Mt. Sinai Medical
Center et al.; Figgie et al., Appellees.
[Cite as Moskovitz v. Mt. Sinai Med. Ctr. (1994),    Ohio
St.3d     .]
Physician and patient -- Medical malpractice -- Where
     liability is determined and compensatory damages are
     awarded, punitive damages pled in connection with the
     claim for malpractice may be awarded, when -- Intentional
     alteration, falsification or destruction of medical
     records by doctor to avoid liability for medical
     negligence is sufficient to show actual malice, and
     punitive damages may be awarded -- "Failed to make a good
     faith effort to settle" in R.C. 1343.03(C), construed --
     In R.C. 1343.03(C) proceeding for prejudgment interest,
     neither the attorney-client privilege nor the so-called
     work product exception precludes discovery of the contents
     of an insurer's claims file -- Order compelling or denying
     discovery in an R.C. 1343.03(C) proceeding for prejudgment
     interest does not meet the definition of "final order" set
     forth in R.C. 2505.02.
                         ---
1.   In a case involving medical malpractice where
     liability is determined and compensatory damages are
     awarded, punitive damages pled in connection with the
     claim for malpractice may be awarded upon a showing
     of "actual malice" as that term is defined in the
     syllabus of Preston v. Murty (1987), 32 Ohio St.3d
     334, 512 N.E.2d 1174. An intentional alteration,
     falsification or destruction of medical records by a
     doctor, to avoid liability for his or her medical
     negligence, is sufficient to show actual malice, and
     punitive damages may be awarded whether or not the
     act of altering, falsifying or destroying records
     directly causes compensable harm.
2.   In prejudgment interest determinations pursuant to
     R.C. 1343.03(C), the phrase "failed to make a good
     faith effort to settle" does not mean the same as
     "bad faith." (Kalain v. Smith [1986], 25 Ohio St.3d

157, 25 OBR 201, 495 N.E.2d 572, followed; Villella v. Waikem Motors, Inc. [1989], 45 Ohio St.3d 36, 543 N.E.2d 464, modified.)

3. In an R.C. 1343.03(C) proceeding for prejudgment interest, neither the attorney-client privilege nor the so-called work product exception precludes discovery of the contents of an insurer's claims file. The only privileged matters contained in the file are those that go directly to the theory of defense of the underlying case in which the decision or verdict has been rendered.

4. An order compelling or denying discovery in an R.C. 1343.03(C) proceeding for prejudgment interest does not meet the definition of "final order" set forth in R.C. 2505.02. Such an order does not determine the action or prevent a judgment, nor is it rendered in a special proceeding. Thus, an appeal from such an order must await final judgment in the prejudgment interest proceeding. (Bell v. Mt. Sinai Med. Ctr. [1993], 67 Ohio St.3d 60, 616 N.E.2d 181, modified.)

---

(No. 93-278 -- Submitted March 2, 1994 -- Decided July 27, 1994.)

Appeal from the Court of Appeals for Cuyahoga County, Nos. 60464 and 61166.

This is a case involving medical malpractice and the death of an elderly woman, Mrs. Margaret Moskovitz. The facts giving rise to this appeal involve the conduct of Dr. Harry E. Figgie III, appellee, who failed to timely diagnose and treat a malignant tumor on Moskovitz's left leg and altered certain records to conceal the fact that malpractice had occurred.

In 1978, Moskovitz was treated by Edward H. Gabelman, M.D., for a tumor on her left leg. The tumor was removed and found to be benign. In 1984, Gabelman completely and successfully removed a second mass from Moskovitz's left leg. This mass was found to be a low-grade malignant dermatofibrosarcoma protuberans. Gabelman performed the 1984 surgery at Mt. Sinai Medical Center ("Mt. Sinai").

In 1985, Moskovitz was referred to Dr. Figgie, an orthopedic surgeon, for treatment of a degenerative arthritic condition in her knees. Figgie was employed by University Orthopaedic Associates, Inc. ("University Orthopaedic"), and specialized in prosthetic joint replacements and degenerative diseases. In October 1985, Figgie performed surgery upon Moskovitz at University Hospitals of Cleveland ("University Hospitals"), replacing Moskovitz's knee joints with artificial knee joints. In May 1986, Moskovitz underwent additional knee surgery performed by Dr. Figgie. Between May and August 1986, Moskovitz visited Figgie's office on a number of occasions due to complications arising from the knee surgeries.

On October 2, 1986, Moskovitz visited Dr. Figgie's office, complaining of a lump on her leg. Figgie examined Moskovitz and detected "a small calcified lesion along the tendoAchilles." Figgie did not recommend a biopsy of the lesion and reassured Moskovitz that nothing was wrong. Figgie was aware that tumors had been removed from Moskovitz's left leg in 1978 and 1984.

On November 3, 1986, Moskovitz was admitted to University Hospitals for a right knee revision. Prior to surgery, Moskovitz was examined by Rick Magas, a registered nurse. Magas's written report of the examination, signed by Dr. Figgie, noted the existence of a firm nodule measuring one centimeter by one centimeter on Moskovitz's left Achilles tendon. Figgie performed the right knee revision on November 5, 1986. Following surgery, Moskovitz was examined on Figgie's behalf by Dr. G. Balourdas, a resident physician at University Hospitals. A discharge summary prepared by Balourdas (and signed by Figgie) noted the existence of a "[l]eft Achilles tendon mass, [1] x 1 cm. nodule." The report indicated that the mass had been present for some time.

Moskovitz continued to see Dr. Figgie through November 1987. On November 10, 1987, Figgie finally removed the mass that had been growing on Moskovitz's left leg.1 On November 13, 1987, the tumor was found to be an epithelioid sarcoma, a rare form of malignant soft-tissue cancer. A bone scan revealed that the cancer had metastasized to Moskovitz's shoulder and right femur.

Immediately following the diagnosis of cancer, Moskovitz's care was transferred to Figgie's partner at University Orthopaedic, Dr. John T. Makley, an orthopedic surgeon specializing in oncology. At that time, Makley received Figgie's original office chart, which contained seven pages of notes documenting Moskovitz's course of treatment from 1985 through November 1987. Makley thereafter referred Moskovitz to radiation therapy at University Hospitals. Apparently, in November 1987, without Figgie's knowledge, Makley sent a copy of page seven of Figgie's office notes to the radiation department at University Hospitals.

In December 1987, Figgie or someone on his behalf requested that Dr. Makley return Figgie's office chart pertaining to the care of Moskovitz. In December 1987, Makley was Moskovitz's primary treating physician and Figgie was no longer directly involved in Moskovitz's care and treatment. On December 14, 1987, Makley's secretary forwarded the chart to Figgie's office. Figgie's secretary then sent a copy of the chart to Dr. Zev Ashenberg, Moskovitz's psychologist. The copy was received by Ashenberg sometime between December 14 and 18, 1987. In January 1988, Makley's secretary requested that Figgie's office return the chart to Makley. At this time, it was discovered that the original chart had mysteriously vanished, never to be seen again.

In February 1988, Makley amputated Moskovitz's left leg. In May 1988, while obtaining a prosthesis for her leg, Moskovitz accidentally fell and broke her right hip due to the cancer having spread to her hip bone. Moskovitz was taken to Hillcrest Hospital and was treated for her injuries. Thereafter, Moskovitz underwent chemotherapy at Hillcrest Hospital.

On October 21, 1988, Moskovitz filed a complaint for discovery in the Court of Common Pleas of Cuyahoga County, seeking to ascertain information relative to a potential claim for medical malpractice. On November 4, 1988, Moskovitz and her husband, Aaron Moskovitz, filed an amended complaint against, inter alia, Figgie, Makley, University Orthopaedic,

University Hospitals, Gabelman and Mt. Sinai.  The amended complaint set forth allegations of medical malpractice against Figgie and others for failing to timely diagnose and treat Moskovitz's cancer before the cancer had metastasized.  The amended complaint further alleged that Makley committed medical malpractice by unnecessarily removing Moskovitz's left leg after the cancer had already spread.  In addition, Moskovitz and her husband set forth claims of negligent hiring against University Hospitals and Mt. Sinai.

On December 5, 1988, Moskovitz died as a result of the cancer.  Prior to her death, Moskovitz's testimony was preserved by way of videotaped deposition.

Makley was deposed on January 30, 1989.  At his deposition, Makley produced a copy of page seven of Figgie's office chart.  (That copy was identical to the copy ultimately recovered by plaintiff's counsel from the radiation department records at University Hospitals.)  The copy produced by Makley contained a typewritten entry dated September 21, 1987, which states:  "Mrs. Moskovitz comes in today for her evaluation on the radiographs reviewed with Dr. York.  He was not impressed that this [the mass on Moskovitz's left leg] was anything other than a benign problem, perhaps a fibroma.  We [Figgie and York] will therefore elect to continue to observe."  However, the photostatic copy revealed that a line had been drawn through the sentence "We will therefore elect to continue to observe." The copy further revealed that beneath the entry, Figgie had interlineated a handwritten notation:  "As she does not want excisional Bx [biopsy] we will observe."  The September 21, 1987 entry was followed by a typewritten entry dated September 24, 1987, which states:  "I [Figgie] reviewed the x-rays with Dr. York.  I discussed the clinical findings with him.  We [Figgie and York] felt this to be benign most likely a fibroma.  He [York] said that we could observe and I concur." At some point, Figgie had also added to the September 24, 1987 entry a handwritten notation, "see above," referring to the September 21 handwritten notation that Moskovitz did not want an excisional biopsy.

Figgie was deposed on March 2, 1989.  At his deposition, Figgie produced records, including a copy of page seven of his office chart.  As his original chart had been lost in December 1987 or January 1988, Figgie had had this copy made from the copy of the chart that had been sent to Ashenberg in December 1987.  The September 21, 1987 entry in the records produced by Figgie did not contain the statement "We will therefore elect to continue to observe."  Apparently, that sentence had been deleted (whited-out) on the original office chart from which Ashenberg's copy (and, in turn, Figgie's copy) had been made, in a way that left no indication on the copy that the sentence had been removed from the original records.

During his deposition, Figgie maintained that he did not discover the mass on the left Achilles tendon until February 23, 1987, and that Moskovitz had continually refused a workup or biopsy.  To support these claims, Figgie produced copies of his secretary's notebooks, which contained messages of telephone calls received by Figgie's office from Moskovitz during the course of her treatment.  One entry appearing in the telephone logs indicates that Moskovitz called Figgie on

February 26, 1987.  The secretary's entry in the notebook states:  "Moskovitz, right foot, coming in today."  (Emphasis added.)  Dr. Figgie's pencilled-in notation beside that message reads:  "Patient seen, refuses workup, left foot, workup left foot."  (Emphasis added.)  The telephone logs also contained an entry for May 5, 1987, indicating that Moskovitz had called Figgie's office that day complaining of pain in her left leg.  Figgie's pencilled-in notation regarding the May 5 entry states that Moskovitz refused to have the tumor biopsied.  However, an entry in the telephone logs for September 11, 1987, indicates that Moskovitz had called Figgie, complaining of the lump on her left leg.  Figgie's pencilled-in notation next to that entry states that Moskovitz had agreed to a workup on September 11, 1987.  The September 11 notebook entry was directly contradictory to the handwritten alterations made by Figgie to the September 21 entry on page seven of the office chart.

During discovery, another copy of page seven of Figgie's office chart (identical to the copy produced by Makley during his deposition) was recovered from the radiation department records at University Hospitals.2  This copy had been received by the radiation department in November 1987, when Moskovitz was referred to radiation therapy by Dr. Makley.  Therefore, it became apparent that the final sentence in the September 21, 1987 entry had been deleted (whited-out) from Figgie's original office chart sometime between November 1987 (when the radiation department obtained a copy of the record) and mid-December 1987, when Ashenberg received a copy of the record from Figgie's office.  Presumably, that alteration occurred in December 1987 while the original chart was in the possession of Dr. Figgie.

All versions of the September 21, 1987 entry obtained during discovery contained the handwritten notation by Figgie "As she does not want excisional Bx [biopsy] we will observe."  That sentence clearly suggested that it was Moskovitz's choice not to have the tumor biopsied during the course of her treatment with Figgie, whereas the typewritten text as it originally appeared in the September 21, 1987 entry indicated that it was Figgie's decision to observe the growth because the tumor was thought to be benign.

Eventually, Figgie's entire office chart was reconstructed from copies obtained through discovery.  The reconstructed chart contains no indication that a workup or biopsy was recommended by Figgie and refused by Moskovitz at any time prior to August 10, 1987.3  Entries in the reconstructed chart for October 2, 1986, February 23, 1987 and May 7, 1987, refer to the mass, but do not mention a suggested biopsy or the refusal of a biopsy.  Additionally, none of the typewritten entries appearing in the reconstructed chart indicates that a workup or biopsy was recommended or refused after August 10, 1987, with the exception of a September 29, 1987 entry, which states that Figgie recommended a biopsy and Moskovitz "did not want to proceed" with a biopsy at that time.

In her videotaped deposition, Moskovitz claimed that she never refused to have the tumor biopsied.  According to Moskovitz, Figgie had repeatedly assured her throughout the course of her treatment that the lump on her left Achilles tendon was merely "tendons."

Following Moskovitz's death, Aaron Moskovitz, executor of Moskovitz's estate, appellant, was designated as plaintiff in the lawsuit in his capacity as executor. In April 1989, a second amended complaint was filed (against all the defendants named in the first amended complaint) to include claims for wrongful death and survivorship. Additionally, appellant asserted allegations against Figgie and University Orthopaedic for punitive damages based upon the alteration of records.

The matter was referred to nonbinding "arbitration"4 in accordance with R.C. 2711.21 and local rules of court. However, the trial court ordered that the issue of punitive damages was not to be considered at the "arbitration" hearing. On December 7, 1989, the three-member "arbitration" panel issued its findings and "award." The panel found in favor of all defendants participating in that proceeding (including Makley), with the exception of Figgie and University Orthopaedic. The panel made the following findings regarding Figgie:

"3.) * * * The evidence supported a finding that plaintiffs' [sic] decedent had a very good chance of long term survival if the tumor was found to be malignant at a time when it was less than one centimeter in size. The evidence supported the fact that the tumor had not grown in size as of May 7, 1987. If Dr. Figgie had performed a biopsy prior to this date, the cancer would not have metastasized and the decedent would have recovered.

"4.) Dr. Figgie failed to recommend at the appropriate time that the growth on the decedent's left ankle be worked up to determine whether or not it was a malignant tumor. The plaintiff testified [by videotaped deposition] he never made such a recommendation to her. Dr. Figgie's office chart, which is the primary reference material in analyzing a physician's conduct, is filled with contradictions and inconsistencies. The panel did not find Dr. Figgie's deposition persuasive in explaining or providing a basis for justifying these irregularities. His secretary's telephone notes were of questionable probative value.

"5.) Even if Dr. Figgie was first informed of the growth on February 23, 1987, he still fell below acceptable standards of care because he did not conduct further investigation till [sic] x-rays performed in September 1987. All handwritten entries which appear on or prior to September 24, 1987, indicating that a biopsy was recommended or that the decedent refused further work-up were subsequent changes of the records done to justify Dr. Figgie's conduct. The sentence 'We will therefore elect to continue to observe' on the September 21, 1987 entry was whited out and the handwritten entry 'as she dose [sic] not want excisional biopsy we will observe' was a subsequent alteration of the records." (Emphasis added.)

Two of the three members of the panel "awarded" appellant $1,352,881.20 in compensatory damages against Figgie and University Orthopaedic. The third member of the panel dissented on the basis that that "award" was too low. The dissent suggested that an "award" of not less than $2 million was warranted and that an award of $5 million would be justified "in light of the facts presented on liability as well as damages." In addition to this award of compensatory

damages, the panel separately "awarded" over $2.9 million in hedonic damages.

Figgie and University Orthopaedic filed notices of nonacceptance of the "award." Appellant filed a notice of nonacceptance concerning the panel's findings in favor of Makley. On December 9, 1989, appellant filed a third amended complaint, naming, as defendants, Figgie, Makley and University Orthopaedic. The case proceeded to trial on the third amended complaint. Without objection from any party, the jury was informed of the outcome of the "arbitration" proceeding and a copy of relevant portions of the "arbitration" decision was admitted into evidence for the jury's consideration.5

At trial, Figgie claimed that he first discovered the tumor on Moskovitz's left leg on February 23, 1987, at which time he recommended a workup in order to consider a biopsy. According to Figgie, Moskovitz refused to have the tumor worked up until September 1987 or biopsied until October or November 1987. However, Figgie's reconstructed office chart indicated that the mass had been discovered by Figgie as early as October 2, 1986. Additionally, the hospital records from Moskovitz's November 1986 knee surgery suggested that the tumor should have been discovered by Figgie before February 23, 1987. Specifically, the report of the preoperative examination by nurse Rick Magas (plaintiff's Exhibit 3) and the discharge summary prepared by Dr. Balourdas (plaintiff's Exhibit 5), both of which were signed by Figgie, noted the existence of the lump on Moskovitz's left Achilles tendon in November 1986. The discharge summary also stated that the mass had been present for some time. Moreover, a February 23, 1987 entry in Figgie's reconstructed office chart contains no references to a suggested biopsy or the refusal of a biopsy.

Figgie was questioned extensively concerning the alteration of medical records. Figgie claimed that after the September 21, 1987 entry had been typed from his dictated notes, he reviewed that entry and found it to be inaccurate. Therefore, according to Figgie, he drew a line through the sentence "We will therefore elect to continue to observe," and added a handwritten notation to reflect that Moskovitz had, in fact, refused to have the tumor biopsied. Figgie denied whiting-out any portion of the typewritten text and claimed to have no knowledge concerning who might have altered the chart in that manner. Figgie admitted that his original office chart had been lost and that certain slides of Moskovitz's tumor had disappeared from Makley's teaching file. Figgie denied any involvement in the loss of any records. Figgie was also questioned concerning the discrepancy between his handwritten notation in the September 21, 1987 entry and the entry appearing in the telephone journals for September 11, 1987. At one point, Figgie admitted that the two entries were "directly contradictory."

Figgie denied that his February 26, 1987 and May 5, 1987 pencilled-in notations in the telephone journals had been fabricated by him to avoid liability. While those notations indicated that Moskovitz had refused a biopsy in February and May 1987, none of the typewritten entries in the chart for February or May 1987 contained any reference to a suggested biopsy or the refusal of a biopsy. Figgie testified that

defacing and destroying medical records reflects a conscious disregard for the rights and safety of a patient. Figgie never sought to have the telephone journals admitted into evidence, although he characterized the entries in the journals as part of his medical records pertaining to the care and treatment of Moskovitz.

Figgie's secretary, Linda Kennedy, testified at trial that she may have whited-out the portions of the September 21, 1987 entry to clean up the records before sending copies to other doctors. However, Kennedy had testified at her deposition that she never whited-out any information on Moskovitz's medical records.

The jury viewed Moskovitz's videotaped deposition in which Moskovitz claimed that she never refused to submit to a biopsy. According to Moskovitz, Figgie had continually reassured her during the course of her treatment that the lump on her left leg was merely "tendons." Aaron Moskovitz also testified that Figgie consistently reassured the decedent that the lump on her leg was just "tendons." According to Aaron, Figgie never recommended a biopsy at any time prior to October or November 1987 and Figgie never informed Mrs. Moskovitz that the lump could be cancerous.

John F. Burke, an economist, testified concerning the value of Moskovitz's services to her family. Burke concluded that the net present value of the loss of services was between $67,506 and $282,614. Burke also testified concerning the loss of income to Aaron Moskovitz as a result of Mrs. Moskovitz's death. According to Burke, the present value of Social Security benefits the decedent would have received over Aaron's remaining projected life span and the value of a yearly stipend the decedent had been receiving from Germany amounted to $22,891 and $30,521, respectively.

Moskovitz's family members testified concerning the losses they suffered and will continue to suffer as a result of Moskovitz's death. Moskovitz's husband and children witnessed the ravaging effects of the cancer during the final year of Moskovitz's life. As a result of the cancer, Moskovitz underwent an amputation of her left leg and was confined to a wheelchair. She suffered a broken hip due to the cancer having spread to her hip bone. She was a patient at Hillcrest Hospital ten times between May 1988 and the date of her death. Moskovitz underwent extensive radiation therapy and chemotherapy, without success. The medical records, the testimony of Moskovitz's family members and Moskovitz's videotaped deposition documented a thirteen-month period of extreme suffering and hardship for the decedent and her family. Appellant's economic damages alone were estimated at approximately $437,749.

Appellant's medical expert, Dr. Charles Bart Engleberg, an oncologist, testified at trial that whether the tumor was discovered by Figgie in October 1986 or February 1987, Figgie deviated from accepted standards of care by failing to remove the tumor prior to the end of March 1987. Engleberg testified that had the tumor been removed during the first few months of 1987, before it had exceeded approximately one centimeter by one and a half centimeters in size, Moskovitz would have fully recovered and the cancer would not have metastasized.

Dr. Michael Simon, an orthopedic surgeon, and Dr. Makley testified as medical experts for the defense. Based upon a later review of x-rays taken during Moskovitz's November 1986 hospital admission, these doctors testified that the cancer had metastasized prior to November 1986, rendering the decedent's death imminent. On rebuttal, Dr. Ralph J. Alfidi, a radiologist, stated that there were no indications in the x-rays taken in November 1986 that the cancer had metastasized by that time. According to Dr. Alfidi, dark spots on the x-rays such as those identified by Simon and Makley as evidence of the spread of cancer generally indicate loss of bone density commonly occurring in postmenopausal women.

During the trial, Makley was granted a directed verdict, as no expert medical testimony had been presented against him. Additionally, appellant dismissed all claims against University Orthopaedic.

On December 20, 1989, the jury returned its verdict in favor of appellant and against Figgie. The jury awarded appellant $2 million on the survival claim, $1.25 million on the claim for wrongful death, $5,000 for funeral and burial expenses and $3 million in punitive damages. In response to an interrogatory concerning its finding of liability, the jury stated:

"Dr. Figgie's records indicate that he was aware of a lesion on the decedent's tendo achilles on 10/2/86. Plaintiff's Exhibits 3 and 5 indicate that, as of 11/3/86, Dr. Figgie was aware of the decedent's left tendo achilles mass and that it had been present for some time. Even with consideration of the decedent's past medical history, Dr. Figgie did not biopsy the tumor at the point of discovery. Hospital records indicate that the decedent's tumor had not metastisized [sic] by 11/3/86. We believe the decedent had a very good chance of long term survival if the tumor was found to be malignant before it exceeded one centimeter in size.

"Also, Dr. Figgie did not maintain his records as according to medical standards."

The trial court entered judgment in accordance with the jury's verdict. Figgie filed a motion for judgment notwithstanding the verdict or, alternatively, a motion for a new trial. Figgie's motion was denied, as was a motion by appellant for prejudgment interest.

Figgie appealed to the court of appeals. Appellant cross-appealed on the issue of prejudgment interest. On January 2, 1991, during the pendency of the appeal, the trial court granted a motion by Makley for Civ.R. 11 sanctions against appellant's trial counsel, Charles Kampinski. The trial court awarded Makley $4,000 and Kampinski appealed. The appeals were thereafter consolidated.

The court of appeals upheld the finding of liability against Figgie on the wrongful death and survival claims. However, in a split decision, the court of appeals found that the award of compensatory damages was excessive and that appellant was not entitled to punitive damages as a matter of law. Therefore, by a two-to-one vote, the court of appeals reversed the judgment of the trial court as to the award of damages and remanded the cause for a new trial only on the issue of compensatory damages. Additionally, by a divided

vote, the court of appeals affirmed the judgment of the trial court denying appellant's motion for prejudgment interest and affirmed the award of Civ.R. 11 sanctions against Kampinski.

The cause is now before this court pursuant to the allowance of a motion to certify the record.

Charles Kampinski Co., L.P.A., Charles Kampinski, Christopher M. Mellino and Donna Taylor-Kolis, for appellants.

Fritz Byers; Jacobson, Maynard, Tuschman & Kalur Co., L.P.A., John V. Jackson II, Robert Seibel and Steven Hupp, for appellee.

Steven S. Zaleznik, Michael R. Schuster and Bruce B. Vignery; Patton, Boggs & Blow and Steven M. Schneebaum, urging reversal for amicus curiae, American Association of Retired Persons.

Jeffrey R. White, urging reversal for amicus curiae, Association of Trial Lawyers of America.

Nurenberg, Plevin, Heller & McCarthy Co., L.P.A., Andrew P. Krembs and Kathleen J. St. John, urging reversal for amicus curiae, Ohio Academy of Trial Lawyers.

Douglas, J.     This appeal presents four issues for our consideration.  Were punitive damages, and the amount awarded, appropriate and proper on the facts of this case?  Were the compensatory damages awarded for the survival action and for wrongful death excessive?  Should prejudgment interest have been allowed?  Was it proper to sanction appellant's attorney under Civ.R. 11?  Figgie has not appealed and, thus, the finding that Figgie was negligent in his care and treatment of Moskovitz is not at issue.

I

Punitive Damages

The jury's award of punitive damages was based upon Figgie's alteration, falsification or destruction of medical records.  The punitive damages were awarded in connection with the survival action.  The court of appeals' majority vacated the award of punitive damages for two reasons.  First, the court of appeals' majority determined that punitive damages were not available under the circumstances of this case, since Figgie's act of altering and destroying records did not directly cause actual harm to appellant -- i.e., records disappeared and were altered after the diagnosis of terminal illness and the alteration and disappearance of the records did not adversely affect appellant's claims.  Second, the court of appeals' majority found that appellant failed to establish a right to punitive damages under the standards set forth in Preston v. Murty (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174. We disagree.

The court of appeals held that for punitive damages to be awarded, appellant was required to prove "a harm distinct from the medical negligence claim and attributable solely to the alleged alteration of medical records."  To support this conclusion, the court of appeals relied upon Shimola v. Nationwide Ins. Co. (1986), 25 Ohio St.3d 84, 25 OBR 136, 495 N.E.2d 391; Bishop v. Grdina (1985), 20 Ohio St.3d 26, 20 OBR 213, 485 N.E.2d 704; and Rouse v. Riverside Methodist Hosp. (1983), 9 Ohio App.3d 206, 9 OBR 355, 459 N.E.2d 593.  However,

nothing in these cases suggests that the malicious intent necessary to sustain an award of punitive damages must itself proximately result in some compensable harm.

Shimola and Bishop, supra, stand for the age-old proposition that proof of actual damages in an underlying cause of action is a necessary predicate for an award of punitive damages. See, also, Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 10 OBR 408, 461 N.E.2d 1273, and Richard v. Hunter (1949), 151 Ohio St. 185, 39 O.O. 24, 85 N.E.2d 109. In Ohio, no civil action may be maintained simply for punitive damages. Bishop, supra, 20 Ohio St.3d at 28, 20 OBR at 214, 485 N.E.2d at 705. Rather, punitive damages are awarded as a mere incident of the cause of action in which they are sought. Id. Thus, compensable harm stemming from a cognizable cause of action must be shown to exist before punitive damages can be considered.

Bishop was a case involving an award of punitive damages where no compensatory damages were awarded on the underlying cause of action. In Bishop, we held that proof of actual damages on the underlying claim is a necessary predicate for an award of punitive damages. Id. at 28, 20 OBR at 214, 485 N.E.2d at 705. In so holding, we relied upon Richard, supra, which also involved a situation where punitive damages were found to be improper in the absence of an award of compensatory damages on an underlying claim. The court of appeals in the case at bar seized upon the statement in Bishop that "[p]unitive damages are awarded as punishment for causing compensable harm and as a deterrent against similar action in the future." (Emphasis added.) Id. at 28, 20 OBR at 214, 485 N.E.2d at 705. However, that statement in Bishop does not require the conclusion that malicious conduct giving rise to punitive damages must produce some compensable harm. Again, the matter at issue in Bishop was whether an award of punitive damages is legally supportable where no actual harm is shown in the underlying cause of action.

In Shimola, supra, 25 Ohio St.3d 84, 25 OBR 136, 495 N.E.2d 391, an insured sued his insurer for the tort of bad faith. The insured sought an award of punitive damages in connection with that claim. The jury awarded no actual damages on the claim, but awarded the insured $160,000 in punitive damages. We held that the award of punitive damages could not be sustained absent proof of actual damages stemming from the underlying claim for bad faith. Id. at 86, 25 OBR at 138, 495 N.E.2d at 393. Shimola clearly does not support the conclusion reached by the court of appeals' majority.

Here, appellant was awarded compensatory damages in the survival claim for Figgie's medical malpractice and that award formed the necessary foundation for the award of punitive damages. Figgie suggests that his alteration of medical records constitutes a separate claim requiring proof of actual damages, that no actual damages were shown to flow from the alteration, and that punitive damages were therefore improper. In this regard, we have recently held that "[a] cause of action exists in tort for interference with or destruction of evidence * * *." Smith v. Howard Johnson Co., Inc. (1993), 67 Ohio St.3d 28, 29, 615 N.E.2d 1037, 1038. However, nothing in Smith can be interpreted to say that a separate cause of action for

spoliation of evidence is the only way such conduct can be addressed and remedied. We expressly reject any such notion. If appellant were constrained to bring a separate cause of action for spoliation of evidence, that claim would inevitably fail since there is no damage flowing directly from the alteration of records. Therefore, no punitive damages could be awarded to punish the unlawful conduct. Thus, if Figgie's argument is taken to its logical conclusion, litigants and prospective litigants could alter and destroy documents with impunity so long as no actual damage was caused thereby. Of course, if the damning evidence were destroyed without trace, no liability would attach on any claim, since no evidence would remain to implicate the spoliator. In our judgment, Figgie's alteration of records was inextricably intertwined with the claims advanced by appellant for medical malpractice, and the award of compensatory damages on the survival claim formed the necessary predicate for the award of punitive damages based upon the alteration of medical records.

The purpose of punitive damages is not to compensate a plaintiff, but to punish and deter certain conduct. See, e.g., Preston, supra, 32 Ohio St.3d at 335, 512 N.E.2d at 1176; Detling v. Chockley (1982), 70 Ohio St.2d 134, 136, 24 O.O.3d 239, 240, 436 N.E.2d 208, 209; and Calmes v. Goodyear Tire & Rubber Co. (1991), 61 Ohio St.3d 470, 473, 575 N.E.2d 416, 419. See, also, Bishop and Richard, supra. Therefore, it would make no sense for this court to establish a rule requiring that malicious conduct giving rise to a claim for punitive damages must independently cause compensable harm before punitive damages may be awarded. If the act of altering and destroying records to avoid liability is to be tolerated in our society, we can think of no better way to encourage it than to hold that punitive damages are not available in this case. We believe that such conduct is particularly deserving of punishment in the form of punitive damages and that a civilized society governed by rules of law can require no less. Figgie's conduct of altering records should not go unpunished. We should warn others to refrain from similar conduct and an award of punitive damages will do just that.

We recognize that certain language in Rouse, supra, 9 Ohio App.3d at 208-209, 9 OBR at 358, 459 N.E.2d at 597, lends some support to Figgie's and the court of appeals' position that later concealment or destruction of evidence of negligence cannot render an act of negligence malicious and, thus, punitive damages are unavailable in such a case absent proof of actual harm stemming from the concealment or destruction. However, we are more persuaded by the case of Spadafore v. Blue Shield (1985), 21 Ohio App.3d 201, 21 OBR 215, 486 N.E.2d 1201. In Spadafore, Judge Moyer (now Chief Justice Moyer) concurred in the following statement of the law concerning punitive damages and the alteration of documents:

"[T]here was some additional evidence, although not substantial, of possible intentional alteration of documents. Such conduct is the type of intentional and deceptive behavior more indicative of actual malice. If such evidence is believed, the jury could award punitive damages. With the proper caution exercised in instructing the jury as to when punitive damages are proper, the issue of punitive damages

should have been submitted to the jury."  Id. at 204-205, 21 OBR at 218, 486 N.E.2d at 1205.

Moreover, in Calmes, supra, 61 Ohio St.3d at 473, 575 N.E.2d at 419, this court stated that "[p]unitive damages in this state are available upon a finding of actual malice." (Emphasis added.)  The term "actual malice" has been defined in the case of Preston, supra, 32 Ohio St.3d 334, 512 N.E.2d 1174, and the definition does not include an element of actual harm. In Preston, syllabus, we held that:

"Actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm."  (Emphasis sic.)

Figgie's alteration of records exhibited a total disregard for the law and the rights of Mrs. Moskovitz and her family. Had the copy of page seven of Figgie's office chart not been recovered from the radiation department records at University Hospitals, appellant would have been substantially less likely to succeed in this case.  The copy of the chart and other records produced by Figgie would have tended to exculpate Figgie for his medical negligence while placing the blame for his failures on Moskovitz.  We find that the evidence adduced at trial fully supported an award of punitive damages under the standards set forth in the Preston syllabus.

The court of appeals' majority also determined that there was no evidence that Figgie altered or destroyed records to conceal his medical negligence.  However, upon a thorough review of the record, we are convinced that the jury was presented with sufficient evidence which, if believed, supported the inference that records were altered, destroyed or concealed by Figgie in an effort to conceal his medical negligence.  A unanimous panel of "arbitrators" determined that records were altered with bad motive, and that Figgie was the responsible party.  Further, having awarded punitive damages, the jury, which heard the evidence and observed the demeanor of the witnesses, apparently, also so found.  A competent and respected trial judge upheld the award of punitive damages and denied a motion for a new trial.  With all due respect to the court of appeals' majority, we believe that the appellate court simply substituted its judgment for that of the jury and, thereby, invaded the province of the finder of fact.  Further, as we stated in Myers v. Garson (1993), 66 Ohio St.3d 610, 614, 614 N.E.2d 742, 745, "we have often noted in the past, where the decision in a case turns upon credibility of testimony, and where there exists competent and credible evidence supporting the findings and conclusions of the trial court, deference to such findings and conclusions must be given by the reviewing court."  In our judgment, the court of appeals' majority erred in holding that, as a matter of law, appellant was not entitled to an award of punitive damages.

Accordingly, we reverse the judgment of the court of appeals on the issue of punitive damages.  We hold that in a case involving medical malpractice where liability is determined and compensatory damages are awarded, punitive damages pled in connection with the claim for malpractice may

be awarded upon a showing of "actual malice" as that term is defined in the syllabus of Preston v. Murty, supra. An intentional alteration, falsification or destruction of medical records by a doctor, to avoid liability for his or her medical negligence, is sufficient to show actual malice, and punitive damages may be awarded whether or not the act of altering, falsifying or destroying records directly causes compensable harm. However, we reiterate that the purpose of punitive damages is to punish and deter. The jury's reaction in awarding $3 million in punitive damages may be understandable, given its findings of Figgie's activities, but it is wrong. Punishment does not mean confiscation. Figgie's net worth (depending on who is believed) is somewhere between $2.1 million and $3 million. We find that a portion of that net worth will send the message.

In determining the appropriate amount of punitive damages to be awarded, we are guided by the perspicuous observations of Judge John W. McCormac in Shoemaker v. Crawford (1991), 78 Ohio App.3d 53, 603 N.E.2d 1114. In ordering a remittitur in Shoemaker for an award of compensatory damages found to be excessive, Judge McCormac stated:

"Determining the amount of damages which is the maximum for adequate compensation is not an easy task. No simple mathematical formula can be applied as to either a minimum or a maximum, and there is a wide range between those figures. The decision rests as much on policy considerations as it does anything else and some degree of arbitrariness cannot be totally divorced from the decision, whether made by us or by the jury." Id. at 66, 603 N.E.2d at 1121-1122.

Much the same can be said in the case at bar with regard to a determination of the appropriate amount of punitive damages. Upon a review of the record, we find that $1 million in punitive damages is the appropriate amount to be awarded. Therefore, with respect to the jury's verdict for $3 million in punitive damages, we order a remittitur of $2 million.6 Upon remand, appellant may elect to accept the remittitur, in which case the trial court shall enter judgment in appellant's favor for $1 million in punitive damages. Conversely, appellant may elect to refuse the remittitur, in which case a new trial should be conducted only on the issue of punitive damages. A jury,7 if one is impanelled for this purpose, shall be instructed that punitive damages in some amount must be awarded and that the jury's determination is to be based upon the evidence presented to them which, we fully recognize, might require a re-presentation of much of the underlying case.

II
Compensatory Damages

The court of appeals' majority found that the award of compensatory damages for the survival action and wrongful death was excessive and that the jury's award was influenced by passion and prejudice. Accordingly, the court of appeals' majority vacated the award and remanded for a new trial only on the issue of compensatory damages. We find that the court of appeals erred in this regard.

A.  Survival Action Award

With respect to the jury's award on the survival claim, the court of appeals' majority found that the award of $2

million was so high that it amounted to a denial of substantial justice, and that the award "was impermissibly influenced by the jury's erroneous consideration of punitive damages." In addition to finding that the jury's consideration of punitive damages was appropriate and proper, we also believe that the jury's consideration of punitive damages cannot form the basis for vacating the award of compensatory damages.

In Ohio, it has long been held that the assessment of damages is so thoroughly within the province of the jury that a reviewing court is not at liberty to disturb the jury's assessment absent an affirmative finding of passion and prejudice or a finding that the award is manifestly excessive. See Toledo, Columbus & Ohio River RR. Co. v. Miller (1923), 108 Ohio St. 388, 402-403, 140 N.E. 617, 621. In the case at bar, we make no such finding as to the compensatory damages awarded by the jury. The jury's $2 million award on the survival claim is not so manifestly excessive that a conclusion must be drawn therefrom that the award was the product of passion and prejudice. The bulk of the award was obviously for the pain and suffering Moskovitz experienced in the final year of her life, and the jury was undoubtedly in the best position to make the assessment of damages. The record is devoid of any evidence that the jury was wrongfully influenced in returning a large award, and the amount of the award itself is not so manifestly excessive at to have warranted the court of appeals' interference with the province of the jury. In addition, the trial judge was in the best position to determine whether the award on the survival claim was manifestly excessive or influenced by passion and prejudice. See, generally, Villella v. Waikem Motors, Inc. (1989), 45 Ohio St.3d 36, 40, 543 N.E.2d 464, 469, and Larrissey v. Norwalk Truck Lines, Inc. (1951), 155 Ohio St. 207, 219, 44 O.O. 238, 243, 98 N.E.2d 419, 426. The trial judge refused to set the verdict aside and denied the motion for a new trial. That determination is entitled to deference.

### B. Wrongful Death Award

As to the jury's $1.25 million award for wrongful death, the court of appeals' majority held that the award was manifestly excessive in light of the economic damages proven and in light of Moskovitz's frail condition prior to the onset of her terminal illness. Again, the determination of damages was a question for the jury and the court of appeals was not at liberty to substitute its judgment for that of the finder of fact. The jury heard evidence concerning a variety of damages suffered by the wrongful-death beneficiaries. Although the jury's award was large, it cannot be said with any degree of certainty that the award was excessive. While Moskovitz may have been frail prior to the onset of her illness, the dissent in the court of appeals ably noted that Moskovitz "was neither an amputee, dead, nor dying when Dr. Figgie failed to adequately diagnose and then treat the cancer." Moskovitz's family unquestionably suffered the loss of a loving wife and mother, and the jury was in a far better position than the court of appeals to determine the value of the losses suffered.

The court of appeals' majority also suggested that the jury's award for wrongful death may have been improperly influenced by certain references at trial to Moskovitz's

concentration camp experience and her survival of the Holocaust. However, we note that both appellant and Figgie commented and presented evidence on this matter. Moreover, upon a careful review of the entire record, we do not find that the jury's award was affected by passion and prejudice.

Based upon the foregoing, we find that the court of appeals erred in vacating the award of compensatory damages on the claims for survival and wrongful death. Therefore, on those issues, we reverse the judgment of the court of appeals and reinstate the judgment of the trial court.

III

Prejudgment Interest

The issue of prejudgment interest has become a complex question. This case is a perfect example of the problem. Accordingly, the matter of prejudgment interest generally, and in this specific case, needs some discussion.

A. Prejudgment Interest at Common Law

Since the 1800s, Ohio courts have recognized a common-law right to prejudgment interest. In Hogg v. Zanesville Canal & Mfg. Co. (1832), 5 Ohio 410, 424, this court said, "But interest is allowed, not only on account of the loss which a creditor may be supposed to have sustained by being deprived of the use of his money, but on account of the gain made from its use by the debtor." In the last paragraph of the syllabus of Hogg, this court said, "In actions for torts the jury may calculate interest on the damages actually sustained and add it to their verdict."

In Lawrence R.R. Co. v. Cobb (1878), 35 Ohio St. 94, paragraph four of the syllabus, this court said, "In awarding damages for an injury resulting from a tort, compensation in the nature of interest may be included." Further, in Cobb, at 98-99, the court stated that "[t]he rule of damages in such case is compensation for the injury, or, in other words, that the injured party should be made whole. And while it is true that such a claim is not one, which, under the statute, bears interest, nevertheless, if reparation for the injury is delayed for a long time by the wrong-doer, the injured party can not be made whole unless the damages awarded include compensation, in the nature of interest, for withholding the reparation which ought to have been promptly made."

In Clevenger v. Westfield Co. (1978), 60 Ohio App.2d 1, 14 O.O.3d 3, 395 N.E.2d 377, paragraph two of the syllabus, the court said that "[t]he jury may assess prejudgment interest in favor of the insured under an automobile collision insurance policy where the insurer does not make a reasonable offer of settlement on or before the date the loss is due and payable." While, admittedly, that court was dealing with a predecessor version of R.C. 1343.03, it also discussed possible recovery of interest under common-law principles. The allowance of prejudgment interest by the Hogg and Cobb courts without a specific statutory provision and the discussion of the common-law right to interest by the Clevenger court confirm that prejudgment interest was known at common law.

Having established that prejudgment interest was known at common law in Ohio, we now move to correct our statement in Bell v. Mt. Sinai Med. Ctr. (1993), 67 Ohio St.3d 60, 63, 616 N.E.2d 181, 183, that "[a]ppellants correctly observe that an

action for prejudgment interest pursuant to R.C. 1343.03(C) constitutes a special proceeding inasmuch as the right to obtain such relief is purely statutory in nature and was unavailable at common law." This statement was incorrect and the cases cited as authority for the proposition do not support it. Prejudgment interest was known at common law and, consequently, an action seeking prejudgment interest does not constitute a special proceeding. See Polikoff v. Adam (1993), 67 Ohio St.3d 100, 616 N.E.2d 213, syllabus, where we said that "[o]rders that are entered in actions that were recognized at common law or in equity and were not specially created by statute are not orders entered in special proceedings pursuant to R.C. 2505.02." See, also, Dayton Women's Health Ctr. v. Enix (1990), 52 Ohio St.3d 67, 74, 555 N.E.2d 956, 962 (Douglas, J., dissenting). Accordingly, we modify Bell to correct our previous error.

B. The Statute -- R.C. 1343.03(C) -- Purpose

In 1982, Representative (now Judge, Tenth District Court of Appeals) Dana Deshler, Jr., introduced and sponsored Am.Sub.H.B. No. 189, 139 Ohio Laws, Part I, 2034. Eventually passed by the General Assembly and signed into law by the Governor, the bill enacted R.C. 1343.03(C), which permits an injured party, in certain circumstances, to recover interest in a tort action from the date the cause of action accrues. Thus, Ohio has created a statutory right to prejudgment interest.

R.C. 1343.03(C) reads:

"Interest on a judgment, decree, or order for the payment of money rendered in a civil action based on tortious conduct and not settled by agreement of the parties, shall be computed from the date the cause of action accrued to the date on which the money is paid, if, upon motion of any party to the action, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case."

In Peyko v. Frederick (1986), 25 Ohio St.3d 164, 167, 25 OBR 207, 209, 495 N.E.2d 918, 921, we said that "[t]he purpose of R.C. 1343.03(C) is to encourage litigants to make a good faith effort to settle their case, thereby conserving legal resources and promoting judicial economy." In Kalain v. Smith (1986), 25 Ohio St.3d 157, 159, 25 OBR 201, 202, 495 N.E.2d 572, 574, this court said that "[t]he statute was enacted to promote settlement efforts, to prevent parties who have engaged in tortious conduct from frivolously delaying the ultimate resolution of cases, and to encourage good faith efforts to settle controversies outside a trial setting."

Thus, the purpose of the statute is clear. What are the components of the statute?

C. Components of the Statute

The statute sets forth certain requirements. First, a party seeking interest must petition the court. The decision is one for the court -- not any longer a jury. The motion must be filed after judgment and in no event later than fourteen days after entry of judgment. Cotterman v. Cleveland Elec. Illum. Co. (1987), 34 Ohio St.3d 48, 517 N.E.2d 536, paragraph one of the syllabus. Second, the trial court must hold a

hearing on the motion. Third, to award prejudgment interest, the court must find that the party required to pay the judgment failed to make a good faith effort to settle and, fourth, the court must find that the party to whom the judgment is to be paid did not fail to make a good faith effort to settle the case. R.C. 1343.03(C).

The statute uses the word "shall." Therefore, if a party meets the four requirements of the statute, the decision to allow or not allow prejudgment interest is not discretionary. What is discretionary with the trial court is the determination of lack of good faith. Since the crux of the statute is "good faith effort" and the ultimate decision whether to award prejudgment interest is reposed in the trial judge and, further, since the standard of review on appeal is abuse of discretion, Ziegler v. Wendel Poultry Serv., Inc. (1993), 67 Ohio St.3d 10, 20, 615 N.E.2d 1022, 1032, the obvious question becomes what is a "good faith effort" or, conversely, when has a party "failed to make a good faith effort to settle"?

### D. Good Faith Effort

R.C. 1343.03(C) clearly requires the development of a judicial standard of good faith. In this court's recent case on the question, Kalain, supra, 25 Ohio St.3d 157, 25 OBR 201, 495 N.E.2d 572, at the syllabus, we said that:

"A party has not 'failed to make a good faith effort to settle' under R.C. 1343.03(C) if he has (1) fully cooperated in discovery proceedings, (2) rationally evaluated his risks and potential liability, (3) not attempted to unnecessarily delay any of the proceedings, and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party. If a party has a good faith, objectively reasonable belief that he has no liability, he need not make a monetary settlement offer."

While the last sentence in this syllabus has caused some difficulty we, nevertheless, reaffirm our holding with the caveat that the last sentence of the syllabus should be strictly construed so as to carry out the purposes of R.C. 1343.03(C).

The effect of Kalain is to place the burden of proof on a party seeking prejudgment interest. This is, to a degree, unfortunate since much of the information needed to make a case for prejudgment interest is in the possession of the party resisting an award. Accordingly, it is incumbent on a party seeking an award to present evidence of a written (or something equally persuasive) offer to settle that was reasonable considering such factors as the type of case, the injuries involved, applicable law, defenses available, and the nature, scope and frequency of efforts to settle. Other factors would include responses -- or lack thereof -- and a demand substantiated by facts and figures. Subjective claims of lack of good faith will generally not be sufficient. These factors, and others where appropriate, should also be considered by a trial court in making a prejudgment interest determination.

Even though the burden of a party seeking an award is heavy, the burden does not include the requirement that bad faith of the other party be shown. Lack of a good faith effort to settle should not be confused with bad faith. As we noted in Kalain, supra, 25 Ohio St.3d at 159, 25 OBR at 202-203, 495

N.E.2d at 574, a party may have failed to make a good faith effort to settle even though he or she did not act in bad faith. In this regard, we now move to correct a statement we made in Villella, supra. Therein, we stated that "a lack of good faith means more than poor judgment or negligence; rather, it imports a dishonest purpose, conscious wrongdoing or ill will in the nature of fraud." Id., 45 Ohio St.3d at 42, 543 N.E.2d at 470. We now find that statement, as it relates to the lack of a good faith effort to settle, does not represent the state of the law as set forth in Kalain. Therefore, we now specifically modify the law stated in Villella by disapproving the above-quoted language. We hold that in prejudgment interest determinations pursuant to R.C. 1343.03(C), the phrase "failed to make a good faith effort to settle" does not mean the same as "bad faith."

In making this so-called good faith determination, a trial court is faced with a number of difficult issues. Two of those issues involve discovery and privilege. After a ruling on discovery has been made by the trial court, the question then arises as to the appealability of that determination.

### E. Discovery -- Privilege -- Appealability

Our review of the extensive transcript of the prejudgment interest hearing conducted in this case sheds some light on the difficulties facing the bench and bar. Without question, one of the most difficult problems concerns the scope of discovery available in a proceeding for prejudgment interest.

In Peyko, supra, 25 Ohio St.3d 164, 25 OBR 207, 495 N.E.2d 918, paragraphs one and two of the syllabus, this court held that:

"1. When a plaintiff, having obtained a judgment against a defendant, files a motion for prejudgment interest on the amount of that judgment pursuant to R.C. 1343.03(C), the plaintiff, upon a showing of 'good cause' pursuant to Civ.R. 26(B)(3), may have access through discovery to those portions of the defendant's insurer's 'claims file' that are not shown by the defense to be privileged attorney-client communications.

"2. If the defense asserts the attorney-client privilege with regard to the contents of the 'claims file,' the trial court shall determine by in camera inspection which portions of the file, if any, are so privileged. The plaintiff then shall be granted access to the non-privileged portions of the file."

Peyko establishes that any determination regarding a party's good faith effort to settle requires a review of the settlement efforts made by a party's insurance carrier(s). Id. at 166-167, 25 OBR at 209, 495 N.E.2d at 921. Most of the information regarding the insurer's efforts will be contained in the claims file. In this regard, Peyko clearly recognizes that a post-trial proceeding for prejudgment interest is amenable to the general discovery process established by the Civil Rules. Indeed, in Cotterman, supra, 34 Ohio St.3d 48, 517 N.E.2d 536, paragraphs two and three of the syllabus, this court held that:

"2. The R.C. 1343.03(C) proceeding is amenable to the discovery process. The trial court should exercise such governance so as to speedily resolve the post-trial discovery.

"3. The Rules of Civil Procedure, as utilized in the general discovery process, are applicable to R.C. 1343.03(C)

proceedings."

However, Peyko provides little guidance on the ultimate question:  What is a privileged communication between an attorney and a client?  We must look to the purposes of R.C. 1343.03(C), 2317.02 and Civ.R. 26 to provide the answer.

The attorney-client privilege has ancient roots.  The history of the privilege can be traced back at least as far as the reign of Elizabeth I, where the privilege was already well established.  See 8 Wigmore, Evidence (McNaughton Rev.1961), Section 2290.  See, also, Spitzer v. Stillings (1924), 109 Ohio St. 297, 142 N.E. 365.  In the modern law, the privilege is founded on the premise that confidences shared in the attorney-client relationship are to remain confidential.  Only in this manner can there be freedom from apprehension in the client's consultation with his or her legal advisor.  Wigmore, supra, at Section 2291.  However, the privilege is not absolute.  That is to say, the mere relation of attorney and client does not raise a presumption of confidentiality of all communications made between them.  Id. at Section 2311.  Moreover, it is beyond contradiction that the privilege does not attach in a situation where the advice sought by the client and conveyed by the attorney relates to some future unlawful or fraudulent transaction.  Advice sought and rendered in this regard is not worthy of protection, and the principles upon which the attorney-client privilege is founded do not dictate otherwise.  See Wigmore, supra, at Section 2298.  See, also, Lemley v. Kaiser (1983), 6 Ohio St.3d 258, 6 OBR 324, 452 N.E.2d 1304, wherein Judge (now Justice) Alice Robie Resnick, writing for this court, found that the attorney-client privilege exists to aid in the administration of justice and must yield in circumstances where justice so requires.

With these principles in mind, it is clear that statements, memoranda, documents, etc. generated in an attorney-client relationship tending to establish the failure of a party or an insurer to make a good faith effort to settle a case contrary to the purposes of R.C. 1343.03(C) are not protected from discovery in an R.C. 1343.03(C) proceeding for prejudgment interest.  Stated otherwise, if, through the lack of a good faith effort to settle, the purposes of R.C. 1343.03(C) have been thwarted by a party and/or the attorneys involved in the case, a search for the truth of that fact cannot be hindered by claims of attorney-client privilege.  Documents and other things showing the lack of a good faith effort to settle by a party or the attorneys acting on his or her behalf are wholly unworthy of the protections afforded by any claimed privilege.

As we have stated, the purpose of R.C. 1343.03(C) is to encourage good faith efforts to settle a case outside the trial setting.  The focus of an R.C. 1343.03(C) post-trial hearing for prejudgment interest must be the pretrial settlement efforts made between the plaintiffs and defendants and/or their insurers.  Often, the only way for a party to prove another party's failure to make a good faith effort to settle is by obtaining the claims file of an insurer. However, the attempt to do so is often met by defense objections to the discoverability of matters contained within the file on the basis of work product or attorney-client privilege.  If access

to the file or matters contained therein is denied on the basis of privilege, the hearing required under R.C. 1343.03(C) may amount to nothing less than a retrial of the entire case. The case at bar is an example of this recurrent phenomenon, although the insurer's claims file in this case was not necessary to show that Figgie and/or those acting on his behalf failed to make a good faith effort to settle the case.

The purpose of Civ.R. 26 is to provide a party with the right to discover all relevant matters, not privileged, that are pertinent to the subject of the pending proceeding. Civ.R. 26(B)(1). As indicated, in some cases, nothing is more relevant in an R.C. 1343.03(C) proceeding than the claims file of an insurer. The file may contain memoranda or other relevant matters which establish the lack of a good faith effort to settle. At the same time, the matters contained within the file may be privileged work product or attorney-client communications, beyond the scope of discovery.

The time has come for this court to define what is and is not a privileged communication8 in an insurer's claims file for purposes of discovery in an R.C. 1343.03(C) proceeding for prejudgment interest. In our judgment, only those attorney-client communications contained in an insurer's claims file that go directly to the theory of defense are to be excluded from discovery. To hold otherwise would be to undermine the entire purpose of a hearing on the issue of prejudgment interest, i.e., to ascertain the truth regarding good faith efforts to settle. Civ.R. 26(B)(3) provides, in part, that "a party may obtain discovery of documents and tangible things prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including his attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing of good cause therefor." In a prejudgment interest proceeding, the good-cause requirement of Civ.R. 26(B)(3) is that which is appropriate to effectuate the General Assembly's purposes of enacting R.C. 1343.03(C) -- to encourage and bring about settlements.

In our continuing efforts to provide guidance to the bench and bar on difficult and pressing issues, we hold that in an R.C. 1343.03(C) proceeding for prejudgment interest, neither the attorney-client privilege nor the so-called work product exception precludes discovery of an insurer's claims file. The only privileged matters contained in the file are those that go directly to the theory of defense of the underlying case in which the decision or verdict has been rendered. Additionally, on occasion, this rule might also apply to the file of a party's attorney.

Having identified the character of discoverable items in an R.C. 1343.03(C) proceeding for prejudgment interest, we reiterate our holding in Peyko, supra, 25 Ohio St.3d 164, 25 OBR 207, 495 N.E.2d 918, paragraph two of the syllabus, that where the defense asserts a claim of privilege with regard to items contained in an insurer's claims file, the trial court shall conduct an in camera inspection to determine which items are privileged. Having so stated, we now move to the question of the appealability of a trial court's order compelling or denying discovery in an R.C. 1343.03(C) proceeding.

Following the ruling in Peyko, supra, this court then decided Bell, supra, 67 Ohio St.3d 60, 616 N.E.2d 181. In Bell, we held that the order of a trial court directing a witness opposing a request for discovery in an R.C. 1343.03(C) prejudgment interest hearing to submit materials to an in camera inspection is not a final appealable order. This court in Bell also, however, indicated that an order in an R.C. 1343.03(C) proceeding permitting discovery after submission of alleged privileged materials for an in camera inspection is an order affecting a substantial right made in a special proceeding. Id. at 64, 616 N.E.2d at 184-185. Thus, according to Bell, such an order is a final order subject to immediate appeal.9 We now find this statement in Bell to be incorrect. The statement was based upon the assumption that prejudgment interest was not known at common law and thus a prejudgment interest proceeding was a special proceeding. As pointed out above, prejudgment interest was known at common law and, thus, any order made in a prejudgment interest proceeding is not one made in a special proceeding.

Accordingly, we further modify Bell to correct our error. In doing so, we hold that an order compelling or denying discovery in an R.C. 1343.03(C) proceeding for prejudgment interest does not meet the definition of "final order" set forth in R.C. 2505.02. Such an order does not determine the action or prevent a judgment, nor is it rendered in a special proceeding. Thus, an appeal from such an order must await final judgment in the prejudgment interest proceeding.

F. R.C. 1343.03(C) Applied to this Case

The court of appeals' majority, citing Kalain, supra, 25 Ohio St.3d 157, 25 OBR 201, 495 N.E.2d 572, affirmed the judgment of the trial court denying appellant's motion for prejudgment interest. Specifically, the court of appeals' majority found that Figgie was not obligated to make a monetary settlement offer because Figgie possessed a good faith, objectively reasonable belief that he was not liable to appellant. We find that determination to be untenable on the facts of this case.

Figgie never made any offer to settle. If Figgie ever had a good faith, objectively reasonable belief that he had no liability, the fact that the "arbitration" panel unanimously found against Figgie should have apprised him that a finding of liability at trial was possible, if not probable. Given the substantial amount of conflicting evidence in this case, the fact that medical records disappeared and were altered and the unanimous determination of the panel of "arbitrators," the inescapable conclusion is that Figgie failed to rationally evaluate his potential liability. Appellant made monetary settlement offers within the limits of Figgie's malpractice insurance coverage. One such offer was for approximately $4.3 million -- the value placed upon this case by the "arbitration" panel, which did not consider the issue of punitive damages. Figgie refused to engage in any settlement negotiations.

We find that, as a matter of law, prejudgment interest should have been awarded on the facts of this case. The trial court's failure to award prejudgment interest was an abuse of discretion.10 We further find that the accrual date of Moskovitz's survival cause of action was January 1, 1988,11 and

prejudgment interest at the statutory rate is to be computed from and including that date up to and including the date the judgment is paid. As to the wrongful death portion of the judgment, interest is to be calculated from and including the date of death, December 5, 1988, up to and including the date the judgment is paid. The amount of interest is to be computed by the trial court upon remand.

IV

Sanctions

The final issue presented for our consideration is whether it was proper for the trial court to have sanctioned appellant's attorney, Charles Kampinski, under Civ.R. 11. Sanctions were awarded in favor of Dr. Makley in the amount of $4,000. This award was based upon the fact that Kampinski did not present expert testimony against Makley at trial to establish that Makley's treatment of Moskovitz deviated from accepted standards of care. The trial court concluded that Kampinski did not have good and reasonable grounds to pursue the action against Makley, particularly after the "arbitration" panel found in favor of Makley on the issue of liability. The trial judge who decided this issue was not the same judge who had presided over the case at trial.

As a preliminary matter, we note that Kampinski, in his individual capacity, did not file a notice of appeal from the judgment of the court of appeals affirming the $4,000 award in favor of Makley. That is, Kampinski currently represents the appellant in this case, and he properly filed a notice of appeal for appellant, without indicating that he himself was appealing from the sanctions imposed upon him personally. To complicate matters, the attorneys who represented both Makley and Figgie do not claim to represent Makley before this court. However, as attorneys for Dr. Figgie, they have briefed the issue of sanctions and seek to uphold the award that was granted in Makley's favor. The conclusion we draw is that the issue of sanctions, which affects Kampinski individually, has become an integral part of all other matters at issue in this case. We find that the notice of appeal filed by Kampinski on behalf of his client was sufficient to encompass the issue of sanctions and that Kampinski may properly be considered an appellant in his individual capacity.

Turning our attention to the merits of the issue, we believe that Kampinski should not have been sanctioned for pursuing the action against Dr. Makley for medical malpractice. The thrust of the allegations against Makley in the final amended complaint was that he unnecessarily amputated Moskovitz's leg and informed her that the amputation was to cure the cancer, rather than to ease her pain. However, in the absence of competent expert medical testimony against Dr. Makley, a prima facie case of medical malpractice could not be maintained.

In his deposition, Dr. Engleberg, plaintiff's medical expert, testified as follows:

"Q  Are you going to state at the trial of this matter [that] * * * Dr. Makley in his care and treatment of Mrs. Moskovitz deviated from the accepted standards of medical care?

"A  I will state that if, in fact, the patient was told that the procedure [amputation] was done in order to cure her

or if, in fact, the patient was not shown to have had a lot of suffering and pain in that leg, then I would say Dr. Makley deviated from the standard of care.

"Q  Okay.  I want to be very clear that if she -- are you talking about informed consent * * * [?]

"A  No, no.  Not necessarily written informed consent.  If the patient understood that there was no chance of cure by having her leg amputated and wanted it done anyway because she had severe intractable pain and that can be demonstrated, then I would not say his care deviated from the standard of care.

"If, on the other hand, it cannot be demonstrated that she was having severe and intractable pain in that leg and the patient did not fully understand that the procedure was not of a curative intent, then I will say he deviated from the standard of care.

"I think the jury should be able to determine which of those sets of facts, which of those scenarios would most closely reflect reality."

Engleberg further testified in his deposition that he had found no evidence of informed consent or of intractable pain.

Engleberg's deposition testimony established a reasonable basis for Kampinski to fashion a complaint against Makley for medical malpractice.  The deposition testimony of Aaron Moskovitz indicated that Mrs. Moskovitz was told that the amputation was for curative rather than palliative purposes.  Thus, the factual predicate for the expert medical testimony that Makley had deviated from accepted standards of care was established by Kampinski prior to trial.  In addition, even though the "arbitration" panel found in favor of Makley on the issue of liability, the panel noted that there was some question as to whether Moskovitz had been properly informed of the purpose of the amputation.  Moreover, given the convoluted machinations of this case, where records were altered, lost and/or not appropriately maintained and where relevant portions of Makley's teaching file had come up missing, it might very well have been legal malpractice for Kampinski not to have Makley available as a defendant at trial.

Kampinski chose not to present the evidence against Makley at trial.  Why that is, we will never know.  However, the purpose of Civ.R. 11 is to prohibit the filing of groundless complaints and the evidence establishes that the allegations asserted against Makley were asserted in good faith.  Accordingly, we reverse the judgment of the court of appeals on this issue and vacate the $4,000 award in favor of Makley.

V
Conclusion

For the foregoing reasons, the judgment of the court of appeals is reversed and the award of compensatory damages is reinstated.  Appellant is entitled to prejudgment interest and we remand this cause to the trial court to calculate the amount of prejudgment interest due and to enter judgment accordingly.  The award of punitive damages is reinstated, but we order a remittitur of $2 million on the punitive damage award.  On remand, appellant may accept the remittitur and a judgment of $1 million in punitive damages, or appellant may refuse the remittitur, in which case a new trial should be conducted only on the issue of punitive damages. The award of sanctions is

vacated.

Judgment reversed<br>
and cause remanded.

Resnick, F.E. Sweeney and Pfeifer, JJ., concur.

Moyer, C.J., A.W. Sweeney and Wright, JJ., dissent.

FOOTNOTES:

1    The record reveals that in November 1986, the mass measured approximately one centimeter by one centimeter in size.  The tumor had doubled in size by September 1987 and continued to grow until it was finally removed in November 1987.

2    We surmise from the information before us that the copy of page seven Makley produced at his deposition was made from the copy in the radiology department records at University Hospitals.

3    An August 10, 1987 entry in the reconstructed chart states:  "Mrs. Moskovitz returns today.  She has had some increase in that swelling and that mass behind her ankle.  She is not particularly tender and it appears to be calcific.  She did not want to proceed with radiographs or work-up today.  We did discuss the possibility of needle or incisional biopsy but she deferred on this."

4    In Schaefer v. Allstate Ins. Co. (1992), 63 Ohio St.3d 708, 711, 590 N.E.2d 1242, 1245, the plurality opinion stated that:  "'Nonbinding arbitration' is a contradiction in terms. For a dispute resolution procedure to be classified as 'arbitration,' the decision rendered must be final, binding and without any qualification or condition as to the finality of an award * * *."

5    Although no party has raised the issue, R.C. 2711.21 was amended, effective October 20, 1987, to provide that a decision rendered in an "arbitration" proceeding authorized by that statute is not admissible into evidence at trial.  See Am.Sub.H.B. No. 327, 142 Ohio Laws, Part II, 3338-3339.  Note that R.C. 2711.21 as it appears in Page's Ohio Rev. Code Ann. (1992) contains a misprint.  Specifically, the final paragraph of R.C. 2711.21 should be designated subsection (D).

6    Since Shaffer v. Maier (1994), 68 Ohio St.3d 416, 627 N.E.2d 986, questions have arisen concerning the authority of an appellate court to order a remittitur.  Where a verdict is found to be excessive but not the result of passion or prejudice, an appellate court may order a remittitur with the consent of the prevailing party.  In Chester Park Co. v. Schulte (1929), 120 Ohio St. 273, 166 N.E. 186, paragraphs five and six of the syllabus, this court held that:

"5.  The Court of Appeals has the same unlimited power and control of verdicts and judgments as the trial court and may weigh the evidence and exercise an independent judgment upon questions of excessive damages and when no passion or prejudice is apparent may modify and affirm the judgment by ordering a remittitur with the consent of the prevailing party.

"6.  If the Court of Appeals in an error proceeding in an action for unliquidated damages finds that the verdict was rendered under the influence of passion or prejudice it has no alternative except to reverse and remand for a new trial." (Emphasis sic.)

In Duracote Corp. v. Goodyear Tire & Rubber Co. (1983), 2 Ohio St.3d 160, 162-163, 2 OBR 704, 706, 443 N.E.2d 184, 186,

we reaffirmed the principles set forth in the fifth paragraph of the syllabus of Schulte.  See, also, Shoemaker, supra, 78 Ohio App.3d 53, 603 N.E.2d 1114.

Civ.R. 59(A) sets forth the grounds upon which a new trial may be granted.  One ground for the granting of a new trial is that the damages awarded are inadequate or excessive, appearing to have been given under the influence of passion or prejudice.  Civ.R. 59(A)(4).  Thus, if an award is excessive and appears to be the product of passion or prejudice, a new trial is proper and should be ordered by a reviewing court.  However, where the award is found to be excessive but not the product of passion or prejudice, a remittitur may be ordered by the appellate court with the consent of the prevailing party.  See Schulte, Duracote and Shoemaker, supra.

7    We make no determination as to the applicability or constitutionality of R.C. 2315.18 and 2315.21(C)(2).

8    R.C. 2317.02(A) sets forth a testimonial privilege respecting communications made between an attorney and a client.  R.C. 2317.02 provides, in pertinent part:

"The following persons shall not testify in certain respects:

"(A)  An attorney, concerning a communication made to him by his client in that relation or his advice to his client * * *.

"(B)(1)  A physician or a dentist, concerning a communication made to him by his patient in that relation or his advice to his patient * * *."

Although R.C. 2317.02 grants a privilege respecting attorney-client communications, the statute does not define what is meant by the term "communication" in that context.  R.C. 2317.02(B)(3) does define "communication" in the context of the physician/dentist and patient relationship to mean "acquiring, recording, or transmitting any information, in any manner, concerning any facts, opinions, or statements necessary to enable a physician or dentist to diagnose, treat, prescribe, or act for a patient."  (Emphasis added.)  Thus, R.C. 2317.02 provides only minimal guidance on the question concerning privileged attorney-client communications that may be contained in an insurer's claims file.  However, given the definition of "communication" in R.C. 2317.02(B)(3) concerning a physician or dentist, it could be argued that, by analogy, a "privileged communication" between an attorney and a client found in an insurer's claims file should be limited to those matters going directly to the theory of defense of the underlying lawsuit.

9    R.C. 2505.02 reads:

"An order that affects a substantial right in an action which in effect determines the action and prevents a judgment, an order that affects a substantial right made in a special proceeding or upon a summary application in an action after judgment, or an order that vacates or sets aside a judgment or grants a new trial is a final order that may be reviewed, affirmed, modified, or reversed, with or without retrial.

"When a court issues an order that vacates or sets aside a judgment or grants a new trial, the court, upon the request of either party, shall state in the order the grounds upon which the new trial is granted or the judgment vacated or set aside."

10    The prejudgment interest proceeding concluded after a

hearing over two days and produced a transcript of three hundred thirty eight pages. The trial court, without explanation, denied prejudgment interest.

11 For purposes of determining the accrual date of the survival action, several events that occurred between November 1987 and the end of January 1988 are significant. These events include the removal of the tumor and the diagnosis of malignancy on November 10, 1987, the identification of the type of tumor on November 13, 1987, Moskovitz's apparent knowledge on November 11, 1987 that the tumor was malignant, and Figgie's receipt of the medical records in December 1987 and the disappearance of those records possibly in January 1988 (see Frysinger v. Leech [1987], 32 Ohio St.3d 38, 512 N.E.2d 337, paragraph one of the syllabus). Although it is difficult to determine the precise accrual date of the survival cause of action given the state of the record before us, we find that January 1, 1988 is the appropriate date of accrual to be used in the calculation of prejudgment interest.

Wright, J., dissenting. I must respectfully dissent, as I would affirm in large measure the decision of the court of appeals.

I

In Part I of the majority's opinion there is found a scholarly discussion of the criteria for punitive damages and an excellent discourse on the concept underlying the tort of spoliation of evidence. I agree that any professional, whether doctor, lawyer, or accountant, found to have committed spoliation with the intent to defraud or otherwise injure a patient or client may be subject to a claim for compensatory or nominal damages coupled with a claim for punitive damages. Further, I see no problem combining a traditional malpractice suit with a cause of action alleging spoliation of evidence. However, I do not agree with the majority's decision to permit punitive damages in a negligence action, because the subsequent spoliation of records does not make the original act of negligence malicious.

My major concern with the majority's opinion is its treatment of the facts surrounding the alleged spoliation. I agree with the suggestion in the majority's opinion that if "records were altered, destroyed or concealed by Dr. Figgie in an effort to conceal his medical negligence," an award of punitive damages may be justified in a separate cause of action. However, the question whether Dr. Figgie "altered certain records to conceal the fact that malpractice occurred" was a hotly disputed issue at trial, an issue vigorously rebutted with lengthy testimony by Dr. Figgie and his nurse. As is true with the determination of any significant fact, it was the province of the jury to make a finding and return a verdict on the issue of the alleged spoliation of evidence. Such a determination is not our task. What the majority overlooked, presumably, is that the trial judge did not include in his charge to the jury one single word concerning this hotly disputed issue of spoliation. Indeed, the entire jury charge dealt strictly with medical malpractice. The plaintiff neither pleaded a cause of action for spoliation nor asked for instructions on spoliation.

I also do not agree with the majority that "[i]f appellant

were constrained to bring a separate cause of action for spoliation of evidence, that claim would inevitably fail since there is no damage flowing directly from the alteration of records."  Some measure of damages will flow inevitably from the alteration of records when the alteration is done to avoid liability for the physician's medical negligence.  At the very least, the plaintiff may have to expend additional time and effort to reconstruct the original records.  Since the purpose of the spoliation is to avoid liability, the plaintiff's ability to succeed in the negligence action may be made more difficult because of the spoliated records.  This harm can be seen in the present case.  Dr. Figgie relied on his version of the records to claim that he was not negligent because he had advised appellant to have a biopsy but she refused his advice.  The inclusion of this statement in his records may have made appellant's claim more difficult to prove.  When a physician commits spoliation of evidence to avoid liability for his or her medical negligence, the patient is automatically entitled to at least nominal damages.  In some cases, for example where the spoliation impairs the future course of treatment of the patient, more than nominal damages may also result.12

Therefore, I would hold that a party must plead a separate cause of action for the tort of spoliation of evidence.  The jury should be instructed that if it finds the defendant altered or destroyed records with the purpose of avoiding liability for his or her negligence, the jury must award at least nominal damages.  The jury may then proceed to the question of punitive damages.  In such a situation, the test of Preston v. Murty (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174, can be met as the jury can properly find that actual malice occurred due to the defendant's "conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm."  The great probability of substantial harm to the plaintiff is that an otherwise meritorious action for negligence will be defeated due to the tortious conduct of the defendant.

Suffice it to say, contrary to the conclusion reached by the majority following its review of the record, the jury did not make a finding that Dr. Figgie was involved in spoliation.13  Without such a finding and verdict, which would be tantamount to a finding of malicious intent or reckless disregard, there exists no basis for punitive damages.  Thus, the court of appeals correctly found that punitive damages were inappropriate in this case, as this was a cause premised on negligence.

In addition to the foregoing, I note that the trial judge was well aware that the jury's total award of $3 million in punitive damages at best equalled and probably far exceeded Dr. Figgie's net worth.  I believe the punitive damage award in this case violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution.  See TXO Production Corp. v. Alliance Resources Corp. (1993), 509 U.S.    , 113 S.Ct. 2711, 125 L.Ed.2d 366; Pacific Mut. Life Ins. Co. v. Haslip (1991), 499 U.S. 1, 111 S.Ct.1032, 113 L.Ed.2d 1; Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc. (1989), 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219.

The jury award of punitive damages having been determined to be without basis, it is perfectly clear that, as stated by the court of appeals, the compensatory damage award was excessive and the product of passion and prejudice. I am convinced that, as the court of appeals pointed out, "the jury's survivorship award [of $2 million] was impermissibly influenced by the jury's erroneous consideration of punitive damages." I also agree fully with the court of appeals that the jury's wrongful death award of $1.25 million was "manifestly excessive."

This court consistently has ruled that where an excessive verdict is the product of passion and prejudice, a new trial must be granted. Larrissey v. Norwalk Truck Lines (1951), 155 Ohio St. 207, 44 O.O. 238, 98 N.E.2d 419, paragraph four of the syllabus. We have emphasized, for example, that "[i]n a trial of a negligence action *** deliberate and persistent appeals to the sympathy of the jury, either directly or indirectly, are improper, as tending to induce either excessive or inadequate verdicts as a result of such appeal to the passion or prejudice of the jury." Book v. Erskine & Sons, Inc. (1951), 154 Ohio St. 391, 43 O.O. 334, 96 N.E.2d 289, paragraph one of the syllabus. Thus, "where the damages awarded are excessive and appear to have been given under the influence of passion or prejudice, the resulting prejudice cannot be corrected by remittitur; the only recourse is the granting of a new trial." (Emphasis added.) Id. at paragraph two of the syllabus. See, also, Guccione v. Hustler Magazine, Inc. (Oct. 8, 1981), Franklin App. No. 80AP-375, unreported, at 33.

Even a cursory review of the record reveals that counsel for Moskovitz leveled "deliberate and persistent appeals to the sympathy of the jury," referring repeatedly, for instance, to Mrs. Moskovitz's confinement in a Nazi concentration camp during the Second World War. The record also indicates that plaintiff's counsel made the spoliation claim, not the malpractice claim, the primary focus of the trial. Moskovitz's counsel devoted most of his cross-examination of Dr. Figgie, ninety pages of testimony, to the alteration of Moskovitz's medical records. In opening statements and again in closing arguments, counsel for Moskovitz emphasized and reemphasized the issue of spoliation, alluding many times to Dr. Figgie's cover-up and the "smoking gun." Throughout the trial, counsel for Moskovitz repeatedly attempted to direct the jury's attention to the allegation that Dr. Figgie had tried to conceal his negligent treatment of Moskovitz by subsequently altering the medical records. But despite this pattern of conduct, as previously stated, the trial court never instructed the jury on the matter of spoliation or gave a limiting instruction thereon. Not even a suggestion of the spoliation issue exists in the trial court's charge to the jury.

In light of the foregoing, I believe the court of appeals correctly found that the jury was wrongfully influenced and that both the compensatory damage award and the award of punitive damages were excessive and the result of passion and prejudice. Therefore, I feel the court of appeals properly remanded the case to the trial court for a new trial on the issue of compensatory damages.

III

I must also address the majority's position on prejudgment interest and the majority's treatment of Bell v. Mt. Sinai Med. Ctr. (1993), 67 Ohio St.3d 60, 616 N.E.2d 181.

The majority begins its discussion of this issue by declaring that a common-law right to prejudgment interest existed in Ohio and, therefore, contrary to a recent decision of this court, a prejudgment interest proceeding is not considered a "special proceeding" for purposes of R.C. 2505.02. Thus the majority concludes, in paragraph four of the syllabus, that "[a]n order compelling or denying discovery in an R.C. 1343.03(C) proceeding for prejudgment interest does not meet the definition of 'final order' set forth in R.C. 2505.02."

This statement by the majority attempts to modify a decision issued by this court just last term. In Bell we were faced squarely with the question of whether an order for discovery in a prejudgment interest hearing was a final appealable order.

The issue we addressed in Bell, however, is not an issue before this court today. Rather, the question we must answer today is whether the award of prejudgment interest was appropriate in this case. We have not been asked to consider the appealability of an order issued during a prejudgment interest hearing. Hence, the lengthy discussion engaged in by this court concerning the appealability of an order issued during a prejudgment interest hearing is nothing more than dicta. Given the recent issuance of the Bell decision, the present case is not the proper forum for such a discussion. Members of this court had ample opportunity to express any reservations concerning that issue during our consideration of Bell, which was decided by six members of this court with the seventh member concurring in judgment only. At a minimum, because it does not address an issue before this court, the dicta should be removed from the syllabus.

I also take issue with the majority's decision of the relevant prejudgment interest question.

It is well-settled law that the decision to award prejudgment interest lies within the sound discretion of the trial court. Huffman v. Hair Surgeon, Inc. (1985), 19 Ohio St.3d 83, 19 OBR 123, 482 N.E.2d 1248. That decision will not be reversed by a court of appeals unless the record reflects an abuse of discretion by the trial court. Kalain v. Smith (1986), 25 Ohio St. 3d 157, 25 OBR 201, 495 N.E.2d 572. The phrase "abuse of discretion" is a term of art defined long ago to mean "more than an error of law or of judgment; it implies an unreasonable, arbitrary or unconscionable attitude on the part of the court." Steiner v. Custer (1940), 137 Ohio St. 448, 19 O.O. 148, 31 N.E.2d 855, paragraph two of the syllabus. Clearly then, the decision of the trial court in this case should remain undisturbed unless that decision was tainted by an unreasonable, arbitrary, or unconscionable attitude.

In my judgment there is no evidence of any abuse of discretion here. The trial court denied Moskovitz's motion for prejudgment interest only after conducting a lengthy hearing on the matter. During the hearing both sides had adequate opportunity to present their evidence and arguments.

Considering the strong disagreement between the parties with respect to several significant facts as well as the lengthy testimony and evidence presented by Dr. Figgie in rebuttal to Moskovitz's charges, plainly the trial court did not abuse its discretion in concluding that Dr. Figgie had a good faith, objectively reasonable belief that he was not liable. Based on this conclusion I believe the trial court properly held that Dr. Figgie was not obligated, pursuant to Kalain, to offer Moskovitz a monetary settlement offer, and that the failure to do so did not reflect a failure of good faith and, of course, did not warrant an award of prejudgment interest.

IV

I strongly believe that the court of appeals correctly reversed and vacated the punitive damage award, reversed the compensatory damage award and remanded the compensatory damage issue for a new trial, and affirmed the denial of the motion for prejudgment interest. Thus, for the foregoing reasons I would affirm the judgment of the court of appeals in part but remand for a new trial on the issue of compensatory damages and the issue of spoliation.

Moyer, C.J., and A.W. Sweeney, J., concur in the foregoing dissenting opinion.

FOOTNOTE:

12  To presume damages arise from the intentional tort of spoliation of evidence is consistent with the long-standing presumption for other intentional torts such as assault, battery and defamation. "[E]very injury imports a damage, though it does not cost the party one farthing, and it is impossible to prove the contrary; for a damage is not merely pecuniary, but an injury imports a damage, when a man is thereby hindered of his right. As in an action for slanderous words, though a man does not lose a penny by reason of the speaking them, yet he shall have an action. So if a man gives another a cuff on the ear, though it cost him nothing, no not so much as a little diachylon, yet he shall have his action, for it is a personal injury." Ashby v. White (King's Bench 1703), 2 Ld. Raym. 938, 955 (Holt, C.J., dissenting). Holt's position prevailed, as the majority was reversed by the House of Lords (1703), id. at 958.

13  In its first paragraph, the majority asserts that Dr. Figgie "altered certain records to conceal the fact that malpractice had occurred," as if the jury made a specific finding on this issue.